UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JULIE SMALL,

<table>
<tr><td></td><td></td></tr>
</table>

|  |  |
|---|---|
| Plaintiff, | **COMPLAINT**   18-CV-5659 |
| - against - | **PLAINTIFF DEMANDS A TRIAL BY JURY** |
| JEFFERSON B. SESSIONS, III,<br>U.S. Attorney General,<br>U.S. Department of Justice, | |
| Defendant. | |

------------------------------------------------------------------x

Plaintiff Julie Small ("plaintiff" or "Small"), through her attorneys, Beranbaum Menken LLP, complaining of Defendant Jefferson B. Sessions, III, U.S. Attorney General, U.S. Department of Justice ("DOJ" or Defendant"), alleges:

## NATURE OF ACTION

1.  Small brings this action to remedy sexual harassment, retaliatory harassment, and unlawful retaliation by DOJ, Bureau of Prisons ("BOP" or the "Agency"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A ("Title VII").

2.  Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief under Title VII.

## THE PARTIES

3.  At all times relevant to this complaint, Small was employed by DOJ's BOP, at the Metropolitan Correctional Center ("MCC"), located in Manhattan.

4.      Defendant Sessions is the United States Attorney General within DOJ, and at all relevant times, plaintiff's employer within the meaning of 42 U.S.C. §§ 2000e(b) and 2000e-16(c).

## PROCEDURAL HISTORY AND JURISDICTION

5.      Small followed all the procedural requisites for bringing this action, to wit:

a.      On October 18, 2013, Small was sexually assaulted by a supervisor at MCC, Lt. Casanova Madison ("Madison").

b.      Within 45 days of the sexual harassment, on October 28, 2013, plaintiff made initial contact with BOP's EEO counselor;

c.      On November 7, 2013, plaintiff had an initial interview with the EEO counselor;

d.      On January 30, 2014, plaintiff signed the Notice of Right to File a Discrimination Complaint, and filed with Defendant her Formal Complaint of Discrimination.

e.      On May 14, 2014, Defendant informed plaintiff that her claims were accepted for investigation;

f.      A hearing was held before an Administrative Judge ("AJ") of the U.S. Equal Employment Opportunity Commission ("EEOC") on January 30, 31, February 1, 2, 3, and 10, 2017.

g.      The AJ issued an Order Entering Judgment (the "Decision"), dated August 31, 2017, in favor of Defendant.

h.      Plaintiff, however, did not receive the Decision until on or about February 19, 2018, when the DOJ, Complaint Adjudication Office ("CAO"), in a letter to counsel dated February 16, 2018, attached a copy of the Decision and sought plaintiff's input as to whether the CAO should accept the AJ's Decision.

2

i.      In a letter to the CAO, dated March 2, 2018, plaintiff's counsel sets forth in detail the errors in the Decision.

j.      On March 23, 2018, the CAO issued the DOJ's Final Order and Memorandum Explaining the Final Order ("Final Order") upholding the AJ's Decision. The CAO sent the Final Order to plaintiff's counsel by regular mail.

k.      Plaintiff has met the jurisdictional prerequisites by filing this Complaint with the Court within 90 days of the date she received the Final Order, as required by 42 U.S.C. § 2000e-16(c).

## FACTUAL ALLEGATIONS

6.      Small began working for the BOP at MCC in 2009 as a GS-7 Medical Records Technician.

7.      Small was an excellent employee. Throughout her employment with BOP she consistently has received "outstanding" ratings on her annual performance reviews.

8.      As a Medical Records Technician, Small's regular shift was from 7:30 a.m. to 4:00 p.m. She also regularly worked overtime as a Custody Officer, supervising inmates, and filled in for other Custody Officers when they attended a two-week Annual Refresher Training.

9.      Madison was one of Small's supervisors when she served as a Custody Officer.

## Defendant's Failure to Use Reasonable Care to Prevent Sexual Harassment

10.     BOP's anti-sexual harassment policy and complaint procedures were deficient and not calculated to prevent sexual harassment.

11.     BOP did not ensure that its supervisors and managers understood their responsibilities under the Agency's anti-sexual harassment policy and complaint procedure.

3

12.     MCC did not train its supervisory and non-supervisory staff on identifying and investigating sexual harassment complaints. MCC's Annual Refresher Training, which was supposed to cover equal employment opportunity matters, did not address sexual harassment.

13.     MCC, and presumably BOP, did not distribute to employees the Agency's Anti-Harassment Policy, or assure that all staff members received the policy. Instead, BOP only made it available for download from its Sallyport page.

14.     Defendant's Anti-Harassment Policy was inadequate and failed to provide BOP employees with a clear explanation of what constituted prohibited sexual harassment. The Policy neglected to define "sexual harassment," but instead only defined the more general term, "harassing conduct."

15.     The BOP Anti-Discrimination Policy failed to list "sexual harassment" as a separate basis for unlawful discrimination.

**MCC's Sexualized Work Environment**

16.     MCC tolerated a highly sexualized work environment.

17.     MCC was overwhelmingly male in terms of both inmates and staff. Out of the approximately 750 to 800 inmates, approximately 20 were women, and out of the approximately 200 employees, around the same number, 20, were female.

18.     It was a well-known practice at MCC for male employees, including supervisors, to greet female employees with hugs and kisses.

19.     Small felt uncomfortable being regularly hugged and kissed by male coworkers.

20.     MCC management was aware that male staff members routinely hugged and kissed female staff members at work, but failed to stop the practice.

4

21.     Charleston Iwaugwu ("Iwaugwu"), formerly MCC Associate Warden, realized after leaving MCC that the hugging and kissing among male and female officers was "inappropriate," and likely made some employees "uncomfortable."

22.     Madison, 6'4" tall, and weighing 350 lbs., also greeted Small, 5'8" and 170 lbs., with hugs and kisses. His greets, however, stood out because he would hold her very tightly.

23.     It was commonplace for male supervisors and co-workers to comment on Small's and other female coworkers' appearance.

24.     Small frequently received unwanted sexual advances from MCC's male employees.

25.     Madison often commented on Small's appearance and made sexual advances. On numerous occasions, he put his arm around Small and whispered in her ear such things as, "so did you make that decision?" "Are we going out tonight?" "Can I have your number?"

26.     Madison's and others' sexual advances left Small feeling uncomfortable. She would try to laugh off the advances, knowing that she would be treated as an outcast within the prison if she complained.

27.     Baseless rumors that Small sent explicit photographs of herself and pornographic videos, and slept around were rampant at MCC.

28.     Defendant was or should have been aware that the work environment was sexually hostile for female employees, like Small, but did nothing to correct the situation.

**Madison's Sexual Assault of Small**

29.     On October 18, 2013, Small boarded one of MCC's elevators, operated by Officer John Alicea ("Alicea"). At the third floor, Alicea picked up Madison, and then, on the ninth

5

floor, two officers who accompanied an inmate. Tr. 1 at 71:1-72:12. The elevator returned to the third floor where the two officers and inmate got off.

30.     While the officers and inmate were exiting the elevator, Madison grabbed Small's arm, spun her around, bent her away from him, and slapped and squeezed her buttock.

31.     Immediately after being dropped off the elevator, Small spoke to her friend and MCC Psychologist, Christina Liberati ("Liberati").

32.     Liberati testified at the EEOC hearing that Small was "very, very upset, almost numb, like in shock and appeared confused and said, 'I don't understand what just happened. I don't believe what just happened.'" Liberati recounted that during the conversation Small became "hysterical" and told her that when she was a child her mother's boyfriend sexually molested her, and when she told her mother what happened, she refused to believe her.

33.     Liberati urged Small to report Madison's assault, but Small said she feared being "blackballed."

34.     Later that afternoon, Small called Madison and said that she needed to talk to him about what happened, and told him that what occurred earlier was "not okay."

35.     When Madison arrived at Small's office that afternoon he put his arm around her and pulled her into the hallway, out of earshot of other employees. Madison then assured Small he wouldn't again do anything like what he did in the elevator and told her not to report the incident. Small felt threatened and said she wouldn't.

**Reporting Madison's Sexual Harassment**

36.     Ten days after the incident, on October 28, 2017, Small reported to MCC's EEO Counselor that while in the elevator, a lieutenant squeezed her buttock, making her very uncomfortable. Fearing retaliation, she refused to disclose Madison's name.

37.     Around that same time, Small also informed Madison's supervisor, Captain Ward, of the incident, but similarly did not reveal Madison as the person who sexually assaulted her.

38.     On November 4, 2013, Small gave written notice to MCC's Warden, Catherine Linaweaver, (the "Warden" or "Linaweaver") that she was sexually assault and identified Madison as the perpetrator.

39.     On November 7, 2013, Small was interviewed by the EEO Counselor and, this time, she named Madison as the harasser.

**The Threat Assessment and Issuing Small a Cease and Desist Order**

40.     In response to Small's memo to Warden Linaweaver on November 4, 2013, MCC convened a Threat Assessment to review Small's allegations.

41.     The goal of a Threat Assessment was to assure prison employees that they can work without fear of harassment and to prevent them from feeling threatened by harassment. Associate Warden Iwaugwu led the team reviewing Small's sexual harassment claim.

42.      Iwaugwu testified at the EEOC hearing that when the Threat Assessment team interviewed Small, she was "broken down as she explained the ordeal that she encountered" and "spoke to us with such passion that will indicate she was hurting." Iwaugwu stated that no one on the team doubted Small's truthfulness.

43.     The Threat Assessment team never spoke with or obtained a statement from Madison. As admitted by Warden Linaweaver at the EEOC hearing, this failing made the process flawed.

44.     At the completion of its review, the Assessment Team recommended to Warden Linaweaver that cease and desist orders be issued to both Madison and Small.

45.     The Warden accepted the Threat Assessment team's recommendation and directed that cease and desist orders be sent to Small, the victim of the sexual harassment, as well as to Madison, the perpetrator.

46.     Iwaugwu testified at the EEOC hearing that he has since come to believe it was a mistake to issue a cease and desist to a complaining employee, like Small, because it effectively punishes her for reporting misconduct.

47.     The issuance of a cease and desist order to both the harasser and the harasser's victim has a chilling effect on the willingness of the victim and other employees to report illegal employment practices.

48.     On information and belief, the Threat Assessment team, in addition to recommending mutual cease and desist orders, proposed that Madison be put on Home Duty.

49.     The Warden, however, did not place Madison on home duty. When American Federation of Government Employees, Local 4148 President, Tyrone Covington ("Covington"), saw that the Warden had not put Madison on Home Duty, he objected.

50.     In response, Linaweaver assured Covington that Madison would not be supervising anyone.

## Small's Need to Take a Medical Leave of Absence

51.     Small continued working at the prison until November 10, 2013, despite having become anxious and depressed. Ordinarily a gregarious person, Small withdrew and became isolated at work. She suffered from diarrhea, headaches, loss of sleep, and panic attacks, and at work spent much of her time crying. She was frightened whenever she saw Madison and had nightmares about him breaking into her home.

52.     At her doctor's urging, on or about November 10, 2013, Small took a 45-day medical leave of absence.

53.     While on leave, Small continued to experience severe emotional distress, for which her internist prescribed antidepressants. Twice, Small had to be hospitalized: once, after suffering from diarrhea for two weeks without medical cause, and the other time, after suffering a panic attack.

54.     Small saw a social worker during her medical leave who diagnosed her as suffering from Post-traumatic Stress Disorder caused by Madison's sexual assault and BOP's failure to protect her after the incident. The social worker found that Small suffered from poor concentration, fearfulness, isolation, anxiety, sadness, helplessness, hopefulness, disorientation, confusion, shaken beliefs and worldview, insomnia, and panic attacks.

## Small's Return to Work

55.     Upon Small's return to work on January 10, 2014, BOP handed her a letter ordering her "to cease and desist any communication with Lt. Madison that may be interpreted as threatening, inappropriate, or interferes with the ongoing investigation."

56.     Small was shocked to receive the cease and desist order, and understandably believed that the Agency was punishing her for making a sexual harassment claim.

57.     Within days of returning from medical leave, Small was assigned for two weeks to a custody post, replacing permanent Custody Officers receiving Annual Refresher Training.

58.     In disregard for Small's wellbeing, MCC had Madison supervise her for the two weeks.

59.     Upon reporting to the custody post and finding Madison as her supervisor, Small became very frightened, believing she could not rely on Madison to protect her in case of an inmate emergency.

60.     Small tried contacting Warden Linaweaver to voice her concerns about Madison supervising her, but Linaweaver refused to speak to her.

61.     Covington reminded Linaweaver that she had promised that Madison would not supervise anyone, let alone Small, while plaintiff's complaint was investigated.

62.     The union's efforts were to no avail, and Madison supervised Small for the entire two weeks of the Annual Training.

**Defendant's Investigation of Small for Misconduct**

63.     After receiving Small's sexual harassment complaint, Linaweaver, in addition to convening a Threat Assessment, referred the matter to BOP's Office of Internal Affairs ("OIA").

64.     OIA, in turn, directed Special Investigative Services ("SIS"), located at MCC, to conduct an investigation rather than assigning the investigation to the central office.

65.     Upon information and belief, OIA referred the investigation of plaintiff's sexual harassment complaint to local authorities because it considered her sexual harassment claim as having lesser importance.

66.     MCC's Special Investigative Agent ("SIA"), Mary E. Wade-Jones ("Wade-Jones"), was in charge of the SIS investigation.

67.     Wade-Jones proved more interested in finding misconduct on Small's part than in reviewing Madison's actions, as reflected in her decision to interview Small, the complainant, three times, and Madison, the alleged harasser, just once.

68.     Wade-Jones used her interviews to try to entrap plaintiff and make her seem deceitful and promiscuous.

69.     Madison had given Wade-Jones an email that Small sent him over a year before which included a photograph of herself. Rather than present the email and then question Small, Wade-Jones hid it and asked if she ever had sent Madison a picture of herself. When Small responded, "No," Wade-Jones, pulled out the picture and said, "yes, you have," to which Small responded that she had simply forgotten.

70.     Wade-Jones pointed to the dress Small wore in the photograph, and said, "[a]nd you're going to tell me that this is not provocative?" Noting that the hem of the dress fell below her knees, Small truthfully replied, "No."

71.     Small's photograph had been taken at a MCC holiday party and was no different from the photographs taken of other employees, all of which were displayed in the prison.

72.     Wade-Jones also questioned Small about a supposedly "flirtatious" email she sent Madison, as part of an effort to suggest that it was somehow appropriate for Madison to publicly slapped and squeeze her buttock.

11

73.     Wade-Jones asked plaintiff whether she ever had an intimate or sexual relationship with Madison, to which Small replied with a categorical denial. Small offered to provide her personal phone and email records demonstrating that she and Madison had no personal correspondence or relationship. Wade-Jones responded that she did not need the records, presumably because they would have only supported plaintiff's claim that Madison's conduct in the elevator was unwelcomed.

74.     Wade-Jones, with Linaweaver's approval, sought and received authorization to search Madison's computer for additional non-work-related emails between him and Small. The ensuing search revealed that, in all, there were three non-work-related emails, including the two discussed above.

75.     By turning the sexual harassment investigation into an inquiry into Small's private life, BOP acted in bad faith and exacerbated the humiliation she already felt from being molested by Madison.

76.     SIS's investigation of Small's alleged misconduct was consistent with the Agency practice, criticized by the EEOC in its 2010 Final Program Evaluation Report for the Federal Bureau of Prisons ("EEOC Evaluation Report"), of retaliating against employees who filed harassment and discrimination charges by subjecting them to disciplinary investigations. ("Multiple employees reported to us that they were subjected to Office of Internal Affairs (OIA) or Office of Inspector General investigations shortly after engaging in EEO activity.")[1]

---

[1] The EEOC Evaluation Report is available at
http://coalition4change.org/EEOC%20Report%20on%20BOP.pdf.

**Disciplining Small**

77.     At the completion of her investigation, SIS's Wade-Jones submitted a report to OIA, dated March 18, 2014, recommending that disciplinary charges be sustained against Madison for Unprofessional Conduct of a Sexual Nature and Misuse of Government Computers.

78.     Wade-Jones also recommended that disciplinary charges be sustained against Small for Misuse of Government Computers on grounds that she sent Madison non-work-related emails, and Lack of Candor, for not being "forthright" about sending Madison a picture of herself.

79.     Finally, SIS recommended that Alicea, the eye witness to the sexual harassment, be disciplined for Failure to Report Violation of Rules/Regulations because he did not report Madison's assault upon Small.

80.     On March 28, 2014, a full five months after Small's first interview with the EEO counselor, OIA sustained the charge that Madison engaged in Unprofessional Conduct of a Sexual Nature, as well as Misused Government Computers.

81.     By taking five months to conclude the investigation of Small's sexual harassment complaint, BOP breached its obligation to provide a prompt investigation.

82.     OIA sustained the Misuse of Government Computers charge against Small.

83.     BOP contravened its own Policy in disciplining Small for Misuse of Government Computers. BOP's Policy Statement permitted employees to use its computers for personal use if the cost is "negligible."

83.     At the EEOC hearing, Agency officials admitted that the cost of sending three non-work-related emails was at best, negligible. Warden Linaweaver further testified that using government computers to send personal emails was commonplace.

13

84.     Disciplining an EEO complainant based upon trumped up charges was a common practice at the BOP. *See* EEOC Evaluation Report ("The vast majority of BOP non-supervisory employees interviewed reported an atmosphere of overall retaliation by management. Multiple employees stated that employees who engage in the EEO process or report discrimination are viewed as troublemakers.")

85.     BOP disciplined Small in retaliation for her bringing a sexual harassment complaint against Madison.

86.     The OIA ordered the removal of the Lack of Candor charge, finding that Small could simply have forgotten the very small number of emails she sent Madison.

87.     The OIA also had removed the charge against Alicea on grounds that it was reasonable for him to have believed that Small would report Madison's offense.

88.     After the OIA sustained the Misuse of Government Computer charge, the threat of disciplinary action loomed over Small for more than two years. Not until April 12, 2016 did BOP advise plaintiff of the disciplinary action she faced: a three-day suspension without pay. (With the intervention of counsel, the discipline was reduced to a letter of reprimand.)

89.     Small lost numerous opportunities for promotion due to the Agency's practice of denying promotions to employees under investigation after complaining of equal employment opportunities violations. *See* EEOC Evaluation Report.[2]

90.     Small applied for 21 jobs with BOP after reporting Madison's sexual harassment. All but one of those jobs entailed transferring to another Agency institution, which Small

---

[2] "Numerous employees reported that members of executive staff order extensive and intense internal investigations against employees based upon false accusations after they report discrimination. Employees reported being investigated, some more than ten times, after they complained of discrimination, harassment, or retaliation." *Id.* at 14-15.

preferred in order to avoid having contact with Madison. For ten of those positions, BOP deemed her "Best Qualified," yet denied all her applications.

91.     Despite consistently "outstanding" ratings of her performance evaluations, Small did not receive a promotion until October 2016 – three years after her sexual harassment complaint.

92.     On information and belief, BOP refused to promote Small in retaliation for her equal employment opportunity activity.

**Failure to Take Adequate Corrective Action in Response to Small's Complaint**

93.     By the time of the EEOC hearing in January and February 2017 -- almost three years after defendant had found Madison guilty of "Unprofessional Conduct of a Sexual Nature" -- DOJ still had not disciplined him.

94.     During the approximately 34 months that Madison went unpunished for his sexual misconduct, he received three temporary promotions to GS-11 spanning a period of 13 months.

95.     Defendant failed to take appropriate remedial action in response to Small's sexual harassment complaint by failing to discipline Madison.

96.     The Agency's failure to discipline Madison also violated its own Anti-Harassment Policy which stated, in pertinent part: "[t]he BOP is responsible for promptly initiating appropriate corrective and disciplinary action, up to and including removal, against personnel who are found to have engaged in harassing conduct...."

97.     Meanwhile, during the EEO proceedings and after, defendant allowed Madison to continue working in the same building as Small.

98.     Defendant also allowed Madison to maintain his supervisory position in Custody, moving him to the 2:00 p.m. to 10:00 p.m. P/M shift, presumably to minimize the hours he and Small worked together.

99.     Changing Madison's shift did not stop Small from having to come into contact with Madison. With Madison working 2:00 p.m. to 10:00 p.m., and Small 7:30 a.m. to 4:00 p.m., their shifts overlapped two hours a day, and Small saw Madison at least twice a week.

100.    Small felt unsafe whenever she saw Madison.

101.    As an alternative to assigning Madison to the P/M shift, BOP could have assigned him to either the Evening Watch or Morning Watch shift, neither of which would have overlapped with Small's Day Watch shift.

102.    As a further alternative, defendant could have re-located Madison to another building within MCC.

103.    BOP's decision to allow Madison to remain at MCC in a supervisory position in Custody, working the P/M shift, penalized Small. Before the sexual assault, Small worked a great deal of overtime as a Custody Officer, earning premium wages. After the sexual assault Small stopped working overtime to avoid coming in contact with Madison.

104.    The harm resulting from defendant's decision to allow Madison to continue working in the same building as plaintiff became especially acute in March 2014 when Small learned that Madison had attempted to introduce a gun into the institution.

105.    Small was in fear for her life when she learned that Madison had brought his gun to the prison. Although she complained to MCC management, it was dismissive of her concerns.

**Coworkers' Unchecked Retaliatory Harassment**

106.    Under BOP's Anti-Harassment Policy, supervisors and management officials are responsible for "[m]aintaining the confidentiality of individual complaints."

107.    BOP supervisors and managers were aware that EEO complaints were not kept confidential, yet tolerated this violation of policy. *See* 2010 Evaluation Report ("Employee perception that the entire EEO process ... lacks confidentiality is widespread.... This creates fear of retaliation because it is likely that the alleged discriminator immediately will know that an employee sought the assistance of an EEO counselor.")

108.    Consistent with the Agency's overall breach of equal employment opportunity complainants' guarantee of confidentiality, Small's sexual harassment complaint was not kept confidential and her allegations against Madison were common knowledge within MCC.

109.    Small's coworkers barraged her with questions regarding her complaint. An inmate even asked Small about her allegations against Madison.

110.    Coworkers made angry comments about Small having reported Madison's misconduct. Some called her a liar, and other spread malicious falsehoods that Small had sent explicit photos of herself to Madison and other male coworkers.

111.    Finding the harassment overwhelming, on March 14, 2014, Small wrote BOP's Regional Director that "[s]ince I have reported the sexual assault I have been outcast and retaliated against."

112.    In response to her complaint to the Regional Director, Linaweaver had her executive assistant, Allia Lewis ("Lewis"), speak with Small, and plaintiff reiterated that she was being harassed by coworkers in retaliation for bringing her sexual harassment charge against Madison.

17

113.    Lewis failed to inform Small's supervisors, the local EEO office, SIS or OIA of plaintiff's allegations of coworker retaliation.

114.    Alicea, like Small, was ostracized for bearing witness to Madison's assault upon Small. Coworkers avoided him and made negative comments about him, including that he was a "rat."

115.    His coworkers' hostility became so unbearable that Alicea had to transfer out of MCC to another BOP institution.

## FIRST CAUSE OF ACTION - SEXUAL HARASSMENT

116.    Small repeats and realleges each and every allegation contained in the above paragraphs of this Complaint with the same force and effect as if set forth herein.

117.    In violation of Title VII, defendant failed to use a reasonable standard of care to prevent sexual harassment.

118.    Defendant permitted a sexualized workplace to exist at MCC.

119.    Defendant subjected Small to a hostile sexual work environment.

120.    Small was subjected to severe or pervasive sexual harassment at MCC, that included, but not limited to:

a.    Routinely being hugged and kissed by her male supervisors and coworkers;

b.    Having her body held and squeezed tightly by Madison when greeting her;

c.    Being regularly subjected to comments from male supervisors and coworkers, including Madison, about her body and appearance;

d.    Being regularly subjected to sexual advances from male supervisors and coworkers, including Madison;

18

e.      Being the object of rumors, with no basis in reality, that she sent explicit

photographs of herself and pornographic videos, and that she was promiscuous;

f.      Being sexually assaulted by Madison on October 12, 2013; and

g.      The same day of the assault, having Madison put his around her while telling her

not to report the incident.

121.    Defendant failed to take prompt, appropriate corrective action in response to

Small's sexual harassment complaint.

122.    Defendant used the investigation of Small's sexual harassment complaint to bring

baseless disciplinary charges against her.

123.    Defendant, in its response to Small's sexual harassment complaint, put her in a

worse position than she had been before she made the claim.

124.    Defendant acted with malice and reckless indifference to plaintiff's rights under

Title VII.

125.    As a result of the defendant's actions, plaintiff has suffered and continues to

suffer economic damages, mental anguish, emotional distress, and other compensable injuries.

## SECOND CAUSE OF ACTION - UNLAWFUL RETALIATION

126.    Small repeats and realleges each and every allegation contained in the above

paragraphs of this Complaint with the same force and effect as if set forth herein.

127.    In violation of Title VII, defendant unlawfully retaliated against Small for

participating in a proceeding under Title VII.

128.    Defendant's acts of retaliation in response to Small's complaint included, but are

not limited to:

a.      Issuing Small a cease and desist order;

b.      Investigating Small's sexual behavior and private life;

c.      Conducting a biased investigation aimed at finding misconduct by Small;

c.      Recommending that disciplinary charges be brought against Small for misusing government property and lack of candor, when there was no basis to either charge;

d.      Disciplining Small for non-existent misconduct; and

e.      Failing to promote Small to positions for which she was determined best qualified;

129.    In taking the above described discriminatory actions, Defendant acted with malice and reckless indifference to plaintiff's rights under the Title VII.

130.    As a result of the Defendant's actions, plaintiff has suffered and continues to suffer economic damages, mental anguish, emotional distress, and other compensable injuries.

## THIRD CAUSE OF ACTION - RETALIATORY HARASSMENT

131.    Small repeats and realleges each and every allegation contained in the above paragraphs of this Complaint with the same force and effect as if set forth herein.

132.    In violation of Title VII, defendant failed to use a reasonable standard of care to protect Small from being harassed by coworkers in retaliation for making her sexual harassment complaint against Madison.

133.    In response to plaintiff's complaint that coworkers were harassing her for retaliatory reasons, defendant failed to refer the matter for investigation, and failed to halt the harassment or take other corrective action.

134.    Defendant acted with willful indifference in response to the unlawful harassment of Small by her coworkers.

135.   As a result of the Defendant's actions, plaintiff has suffered and continues to suffer economic damages, mental anguish, emotional distress, and other compensable injuries.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a. Declaring that the acts and practices complained of herein are in violation of Title VII;

b. Enjoining and permanently restraining these violations of law;

c. Directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment;

d. Directing defendant to place plaintiff in the position she would have occupied but for defendant's unlawful conduct, and making her whole for all earnings and other benefits she would have received but for defendant's unlawful conduct, including but not limited to wages, other lost benefits, and interest thereon;

e. Directing defendant to pay plaintiff $300,000 in compensatory and/or punitive damages;

f. Ordering defendant to report to the Court what measures it has taken to address the deficiencies in its EEO program identified both in this case and the EEOC Evaluation Report, and the effectiveness of those measures;

g. Awarding plaintiff the costs of this action together with reasonable attorney's fees; and

h. Granting such other and further relief as this Court deems necessary and proper.

21

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury on all issues.

Dated:   New York, New York
         June 21, 2018

BERANBAUM MENKEN LLP

By: _____
     John A. Beranbaum
     80 Pine Street, 33rd floor
     New York, NY 10005
     (212) 509-1616