

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/31/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JULIE SMALL,

            Plaintiff,

     -against-

MERRICK B. GARLAND, *Attorney General of the United States*,

            Defendant.

18-CV-5659 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

      Plaintiff Julie Small brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*., as amended (Title VII), alleging that she was subject to unlawful sexual harassment, retaliation, and retaliatory harassment while employed by the Federal Bureau of Prisons (BOP) at the Metropolitan Correctional Center (MCC) in Manhattan.[1] Plaintiff alleges that another MCC employee, Lieutenant Casanova Madison, sexually assaulted her in an MCC elevator on October 18, 2013 by smacking and squeezing her buttocks, and – more generally – that she was forced to endure a sexualized workplace at the MCC.

      Plaintiff further alleges that after she reported the elevator assault to MCC management on November 4, 2013, she was subject to retaliation by the BOP, including the issuance of an initial cease-and-desist letter prohibiting her from further interaction with Madison, followed by a formal letter of reprimand for using her government computer to exchange personal emails with Madison. The emails, exchanged in July 2013, were uncovered during the BOP's investigation of the elevator incident. Plaintiff was not otherwise disciplined. Madison, who also

---

[1] The BOP is under the purview of the United States Department of Justice (DOJ). When this action was filed, Jefferson B. Sessions III was the United States Attorney General and was named, in his official capacity, as the defendant herein. By Order dated March 25, 2021 (Dkt. No. 70), Merrick B. Garland, the current Attorney General, was substituted as the defendant.

received a cease-and-desist letter at the outset of the investigation, was quickly moved to a different shift, to reduce any potential interaction with Small, and ultimately suspended for 30 days as discipline for the elevator assault, the use of his government computer to exchange personal emails with Small, and an unrelated incident in which he "inadvertently" attempted to enter the MCC with a personal firearm.

Plaintiff further contends that she was passed over for several promotions between October 28, 2013 and July 19, 2016, at which point she was in fact promoted. Finally, plaintiff claims that she was subjected to retaliatory harassment at the hands of coworkers who made demeaning comments about her, would not permit her to heat up food, spread lascivious rumors about her, and on two occasions transported her to the roof of MCC instead of the floor she requested.

On January 30, 2014, plaintiff filed a complaint of sexual harassment with the Equal Employment Opportunity Commission (EEOC), which she later amended to add retaliation claims. On August 31, 2017, after a seven-day evidentiary hearing, an EEOC Administrative Judge (AJ) issued an order in favor of defendant. On March 23, 2018, the DOJ upheld the AJ's decision. Small filed this action on June 21, 2018.

Now before the Court is defendant's motion for summary judgment on all three of plaintiff's claims. As to her sexual harassment claim, defendant argues that to the extent it is premised on conduct other than the October 2013 elevator assault, it is barred for failure to exhaust administrative remedies, because plaintiff's EEOC complaint was limited to that incident. Even if incidents other than the elevator assault are considered, defendant contends that the harassment claim fails on the merits because plaintiff cannot establish severe or pervasive harassment, nor a continuous and concerted course of harassment sufficient to alter the

conditions of her working environment. Defendant further contends that the harassment cannot be imputed to the BOP, because Madison was not plaintiff's supervisor; because she cannot show that the BOP knew or should have known of the offensive conduct but failed to take appropriate corrective action; that the BOP did take appropriate corrective action, which successfully put an end to the harassing behavior; and that, even if Madison was plaintiff's supervisor, the BOP exercised reasonable care to prevent and promptly correct any sexually harassing behavior.

With respect to plaintiff's retaliation claim, defendant argues that the cease-and-desist letter issued to both plaintiff and Madison was not an adverse employment action; that the formal reprimand she later received (in lieu of a three-day suspension, as originally recommended by her supervisor) was appropriate in light of her personal use of her BOP email, and not retaliatory; and that she was passed over for promotions due to legitimate non-retaliatory reasons, with her October 2016 promotion further belying any claim of retaliatory failure-to-promote. Finally, defendant argues that plaintiff's retaliatory harassment claim fails because she does not allege any instances sufficiently severe to create a hostile work environment, and the BOP was not adequately notified of the harassment in a manner that would have enabled leadership to take remedial action.

For the reasons set forth below, defendant's motion will be granted to all of plaintiff's claims except the portion of her retaliation claim premised on the reprimand that she received for personal use of a BOP computer, which a reasonable jury could find to have been a pretext for retaliation, and which, therefore, may proceed to trial. As to plaintiff's harassment claim, the Court concludes that Madison was not plaintiff's supervisor; that defendant was not negligent in controlling her working conditions; that defendant provided an appropriate avenue for plaintiff to lodge her complaint, which she did ten days after the incident; and that the BOP promptly

investigated the complaint and took remedial measures. As to the portion of plaintiff's retaliation claim premised on the alleged failure to promote, plaintiff has presented no evidence that retaliatory intent played any role in the promotions that she did not get – all of which were competitive – while defendant has presented evidence (including the fact that she was promoted in October 2016) that there was no such intent. The Court further concludes that the handful of isolated incidents that plaintiff complains of following her protected activity do not rise to the level of a hostile work environment; consequently, her retaliatory harassment claim also fails.

Accordingly, for the reasons set forth more fully below, defendant's motion for summary judgment will be denied with respect to the portion of plaintiff's retaliation claim based on the issuance of the formal reprimand for personal computer use, and otherwise granted.

## I.   BACKGROUND

### A.   Facts

The relevant facts are taken from (i) defendant's Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1 (Def. 56.1 Stmt.) (Dkt. No. 52); (ii) the Declaration of Barbara Latham (Latham Decl.) (Dkt. No. 50); (iii) the Declaration of Rachel L. Doud (Doud Decl.) (Dkt. No. 49), together with the evidentiary materials attached thereto; (iv) plaintiff's Response to Defendant's Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1 (Pl. 56.1 Resp.) (Dkt. No. 61); (v) the Declaration of John A. Beranbaum (Beranbaum Decl.) (Dkt. No. 59), together with the evidentiary materials attached thereto; and (vi) the Reply Declaration of Rachel L. Doud (Doud Reply Decl.) (Dkt. No. 65), together with the evidentiary materials attached thereto, and the Supplemental Declaration of Barbara Latham (Latham Supp. Decl.) (Dkt. No. 66), but only to the extent that these materials respond directly to new material issues raised in plaintiff's opposition papers. *See Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000) ("reply papers may properly address new material issues

4

raised in the opposition papers") (internal citation omitted); *accord Kellman v. Metropolitan Transp. Auth.*, 8 F. Supp. 3d 351, 371 n.10 (S.D.N.Y. 2014).

Except where otherwise noted, the facts are undisputed. Where the material facts are disputed, the Court has, as required, resolved those disputes in favor of the plaintiff for purposes of the pending motion. *See Benn v. Kissane*, 510 F. App'x. 34, 36 (2d Cir. 2013) (summary order) ("a federal court considering a summary judgment motion must resolve material factual disputes in favor of the non-moving party."), *cert. denied*, 571 U.S. 820 (2013).

### 1.     BOP's Anti-Discrimination and Anti-Harassment Policies

The BOP's Anti-Discrimination Policy forbids discrimination, harassment, and retaliation of any kind, including sexual harassment, unwelcome sexual advances, requests for sexual favors, and other verbal or physical harassment of a sexual nature. Def. 56.1 Stmt. ¶ 12; Pl. 56.1 Resp. ¶ 12. Its Anti-Harassment Policy provides that "BOP will not tolerate harassing conduct by anyone in the workplace," including harassing conduct of a sexual nature. Def. 56.1 Stmt. ¶ 13; Pl. 56.1 Resp. ¶ 13. These policies – at least, the versions referenced in defendant's moving papers, Doud Decl. Ex. C (Dkt. No. 49-3) at 187-99 – did not come into effect until June 16, 2014, ten months after the October 2013 elevator incident. *Id.*; Pl. 56.1 Resp. ¶¶ 12-13. However, the BOP's Discrimination and Retaliation Complaints Processing Policy (Complaints Processing Policy), which was in place in October 2013, included a chapter addressing sexual harassment, which explicitly stated that the BOP "will not condone acts of sexual harassment or inappropriate behavior by staff or inmates" and that "[a]ll employees will be informed that sexual harassment is prohibited conduct[.]" Doud Reply Decl. Ex. EE (Dkt. No. 65-1) at US06061-64. The Complaints Processing Policy also stated that the agency "will not condone retaliation against the victim or any employee who provided information related to the allegations," and that management should scrutinize employment decisions affecting the victim and witnesses "during

and after the investigation to ensure such decisions are not based on retaliatory motives." *Id*. at US06062-63. Further, the BOP's February 5, 1999 Standards of Employee Conduct required that "employees conduct themselves professionally" and "in a manner which will not be demeaning to inmates, fellow employees, or others," and warned that employees violating the standards may be subject to sanctions. Def. 56.1 Stmt. ¶ 14; Pl. 56.1 Resp. ¶ 14; Doud Decl. Ex. E (Dkt. No. 49-5) (Standards of Employee Conduct) at 2, 7, 9.

Pursuant to the Anti-Harassment Policy, when a BOP supervisor or management official witnesses or receives an allegation of harassing conduct, he or she must take appropriate action to stop the conduct and prevent further harassing conduct, and must determine (1) whether a "threat assessment" is needed, and (2) whether to report it to the warden of the facility for possible referral to the Office of Internal Affairs (OIA). Def. 56.1 Stmt. ¶ 20; Pl. 56.1 Resp. ¶ 20. A threat assessment entails an evaluation by the warden and, as appropriate, a team of other staff, as to whether a staff member poses a threat to anyone at the institution. Def. 56.1 Stmt. ¶ 21; Pl. 56.1 Resp. ¶ 21. The relevant written policies were posted on the BOP's intranet, available to all staff on any agency workstation. Def. 56.1 Stmt. ¶ 16; Pl. 56.1 Resp. ¶ 16.

In addition to maintaining the written policies summarized above, the BOP provided its employees with instruction on its anti-discrimination and anti-harassment policies at mandatory yearly refresher trainings. Def. 56.1 Stmt. ¶ 17; Pl. 56.1 Resp. ¶ 17. The slide decks from the 2012 and 2013 trainings include separate slides (in the section of the deck entitled "Discrimination and the EEO Process") covering "Harassment and Hostile Work Environment," "Sexual Harassment," and "Hostile Work Environment." Doud Reply Decl. Ex. FF (Dkt. No. 65-2) at US02128-34; *id*. Ex. GG (Dkt. No. 65-3) at US02193-96. There are no slide decks for the 2014 training in evidence, but there are course outlines for the 2013 and 2014 trainings; they

both include a one-hour timeslot for the subject, "Discrimination and the EEO Process," but no further detail. Pl. 56.1 Resp. ¶ 17; Doud Decl. Ex. C at 173-78.

Catharine Linaweaver, who served as Warden at the MCC from 2013 to 2014, testified at the EEOC hearing that the annual trainings covered that the BOP "has a zero tolerance policy on sexual harassment of any type." Beranbaum Decl. Ex. 1 (Dkt. Nos. 59-1 and 59-2) (EEOC Tr.) at 669:14-674:22. Esker Tatum, who was the MCC Warden from March 2016 through January 2018, also testified that sexual harassment was covered annually. Doud Decl. Ex. I (Dkt. No. 49-9) (Tatum Dep. Tr.) at 6:10-11, 9:3-11:17. However, Tyrone Covington (who at the time of the relevant events was a Senior Officer Specialist at the MCC and the President of Local MCC/NY 3148) testified at the EEOC hearing that there was not "a specific area" discussing sexual harassment, and how to go about investigating it, during the annual trainings. *See* Beranbaum Decl. Ex. 12 (Dkt. No. 59-17) (Covington Decl.) ¶ 1; EEOC Tr. at 651:10-20.

During plaintiff's deposition, when she was asked if sexual harassment specifically was discussed at the annual trainings, she testified that she could not remember if it was discussed each time but she "would think so." Doud Decl. Ex. A (Dkt. No. 49-1) (Small Dep. Tr.) at 38:21-39:25. In her motion papers, however, plaintiff denies that the annual trainings addressed sexual harassment, pointing to her own equivocal deposition testimony and Covington's hearing testimony (as well as other testimony that, upon inspection, does not state or suggest that the annual trainings did not cover sexual harassment). Pl. 56.1 Resp. ¶ 17. For purposes of defendant's summary judgment motion, therefore, the Court accepts that there is a dispute of fact as to whether sexual harassment was specifically discussed at each and every annual training.

It is undisputed that wardens received additional training, including training on sexual harassment, at wardens' conferences. Def. 56.1 Stmt. ¶ 18; Pl. 56.1 Resp. ¶ 18.

### 2. Plaintiff and Madison: Background and Roles

Plaintiff Small has been employed by the BOP at MCC since 2009. Def. 56.1 Stmt. ¶ 1; Pl. 56.1 Resp. ¶ 1. From 2009 until September 2016, she worked as a General Schedule level 7 (GS-7) Medical Records Technician, reporting to the Assistant Health Service Administrator and, ultimately, the Health Service Administrator. Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Resp. ¶ 2. Her primary responsibilities included maintaining medical records of inmates and processing outside requests for medical information, but, like all other MCC staff, she was also responsible for assuming a correctional (or "custody") post – *i.e.*, supervising inmates – if needed. Def. 56.1 Stmt. ¶¶ 3-4; Pl. 56.1 Resp. ¶¶ 3-4.

Casanova Madison has been a Lieutenant at MCC since 2010. Def. 56.1 Stmt. ¶ 8; Pl. 56.1 Resp. ¶ 8. At the time of the events complained of, Madison was one of 10 to 12 lieutenants who supervised the correctional officers overseeing inmates at MCC. Def. 56.1 Stmt. ¶ 9; Pl. 56.1 Resp. ¶ 9.

Madison is not directly in plaintiff's reporting line, and he has never had the authority to fire or promote her, affect her benefits, or make any changes to her employment status; however, when plaintiff worked a custody post, Madison would directly supervise her for those shifts, including an estimated 95% of the 47 eight-hour overtime shifts she worked between October 18, 2012 and on October 18, 2013 (the date of the elevator assault). Def. 56.1 Stmt ¶ 10; Pl. 56.1 Resp. ¶ 10; Latham Decl. ¶¶ 3-6; Beranbaum Decl. Ex. 2 (Dkt. Nos. 59-3 and 59-4) at 42-43; EEOC Tr. at 42:11-43:11, 48:8-19, 370:22-371:4. When plaintiff worked a custody post, Madison, as the Activities Lieutenant, had broad authority to oversee her and the other officers working custody, including planning, scheduling, and coordinating their work, re-assigning them to less (or more) desirable posts, giving orders regarding how duties were carried out, awarding overtime, skipping employees on the overtime list, investigating misconduct, recommending

employees for promotions or special awards, and ordering employees to fill a post to relieve another employee having lunch. Pl. 56.1 Resp. ¶ 10; Covington Decl. ¶¶ 4, 8-13.[2] Plaintiff worked a custody post either voluntarily or when needed on a limited basis, including being called to do lunch relief approximately twice a month. Def. 56.1 Stmt. ¶ 11; Pl. 56.1 Resp. ¶ 11; Small Dep. Tr. at 156:17-157:7.

### 3.    Work Environment Prior to October 2013 Incident

Beginning in 2010, when she joined the MCC, plaintiff greeted her colleagues with a hug and a kiss, a practice that was common among MCC employees. Def. 56.1 Stmt. ¶ 96; Pl. 56.1 Resp. ¶ 95. Although plaintiff testified, at the EEOC proceeding, that it made her uncomfortable, EEOC Tr. at 47:5-23, she acknowledges that she both initiated and reciprocated this type of greeting with both male and female colleagues, including Madison. Def. 56.1 Stmt. ¶¶ 23-24, 97; Pl. 56.1 Resp. ¶¶ 23-24, 96. Plaintiff never informed any of her colleagues – including Madison – that these greetings made her uncomfortable. Def. 56.1 Stmt. ¶¶ 24, 98; Pl. 56.1 Resp. ¶¶ 24, 98. At deposition, plaintiff testified that following the elevator incident with Madison in October 2013, she no longer wanted to greet other employees with a hug and a kiss, and "just stop[ped] doing it." Def. 56.1 Stmt. ¶ 100; Pl. 56.1 Resp. ¶ 100. Plaintiff further testified that she continued engaging in the practice with one male friend named Cole, even after the elevator incident, but that prior to the incident, she would exchange physical greetings "a lot more often." Small Dep. Tr. at 45:12-46:18.

---

[2] In her reply declaration, Barbara Latham, a former MCC Human Resources manager, describes Madison's scope of authority over non-correctional officers working a custody post in more limited terms. *See* Latham Supp. Decl. ¶¶ 5-9, 11-15. The Court thus accepts that there is a dispute of fact as to this relatively narrow issue – the extent of Madison's supervisory authority over plaintiff *when* she worked a custody post – which the Court resolves in plaintiffs' favor for purposes of the instant motion.

Prior to the elevator incident, Small heard certain colleagues comment on the appearance of staff members and what they were wearing, including Madison, who, among other things, commented on plaintiff having a "big rear end," and Captain Ward, Lieutenant Cruz, Officers Gonzales, Officer Merrick, Officer Schuppel, and Officer Reyes, all of whom commented on plaintiff's and other female coworkers' appearances. Def. 56.1 Stmt. ¶ 101; Pl. 56.1 Resp. ¶ 101; Small Dep. Tr. at 59:24-60:10, 209:12-211:8. Captain Ward would "always tell [plaintiff] how pretty [she] was"; Officer Gonzales once texted her "I want to be with you. Be my girlfriend. I'm in love with you. You're so beautiful"; and others made comments to her such as, "Oh, Ms. Small, you're looking good in that uniform," "you got a fat behind," or "you smell good today." Def. 56.1 Stmt. ¶ 102; Pl. 56.1 Resp. ¶ 102; Small Dep. Tr. at 216:16-18, 220:1-8; EEOC Tr. at 44:5-12. Plaintiff also heard an unnamed male officer ask an inmate (in reference to jeans she was wearing on the day Madison smacked her buttocks), "Why else would people come in here with tight clothing and not expect anything?" Pl. 56.1 Resp. ¶ 102; Beranbaum Decl. Ex. 11 (Dkt. Nos. 59-15 and 59-16) (Small EEOC Dep. Tr.) at 125:17-126:2. When asked about unwanted sexual advances at deposition, plaintiff testified that officers (some unnamed) asked her out to eat and for her number, including Officers Milton Gonzales and Clark Mullens, and that Madison made (unspecified) unwanted advances, as well. Def. 56.1 Stmt. ¶ 103; Pl. 56.1 Resp. ¶ 103; Small Dep. Tr. at 60:23-62:17. With respect to such comments and advances, plaintiff laughed them off and the officers "eventually stopped," but after Gonzales texted plaintiff that he was in love with her, plaintiff had her husband respond to him. Def. 56.1 Stmt. ¶ 104; Pl. 56.1 Resp. ¶ 104; Small Dep. Tr. 62:18-25.

Plaintiff also testified that unnamed co-workers spread rumors that she sent explicit photographs of herself to Madison and others. Plaintiff's knowledge of these rumors is based on

one conversation that occurred in 2014, in which a co-worker (whose identity she could not recall) told her there was a rumor that she sent a video to Madison. Def. 56.1 Stmt. ¶ 105; Pl. 56.1 Resp. ¶ 105. However, two of plaintiff's coworkers, Marisol Vega and Tijuana Doctor, stated in affidavits during the BOP internal investigation of the October 18, 2013 elevator incident, that there were explicit photographs of plaintiff "flowing around the building." Pl. 56.1 Resp. ¶ 105; Beranbaum Decl. Ex. 26 (Dkt. No. 59-31) at 419, 421.

### 4.    October 2013 Incident

Plaintiff and Madison were friendly acquaintances for at least a year before October 2013. Def. 56.1 Stmt. ¶¶ 22-24; Pl. 56.1 Resp. ¶ 22-24. Prior to the October 2013 incident, they frequently saw each other around MCC, engaged in conversation, and greeted each other with a hug and a kiss, with plaintiff both initiating and reciprocating the greeting, and never complaining that it was unwelcome. Def. 56.1 Stmt. ¶¶ 23-24; Pl. 56.1 Resp. ¶¶ 23-24. A handful of emails from July 2013, discussed in greater detail below, showed that they, at least on one occasion, flirted with each other. Def. 56.1 Stmt. ¶¶ 59-61; Pl. 56.1 Resp. ¶¶ 60-62.

On October 18, 2013, plaintiff was in an elevator with Madison, elevator operator John Alicea, two other MCC corrections officers, and an inmate. Def. 56.1 Stmt. ¶ 25; Pl. 56.1 Resp. ¶ 25. The elevator occupants were discussing plaintiff's recent weight loss. Madison commented, "[y]ou're losing the weight" and "it looks good." Def. 56.1 Stmt. ¶ 26; Pl. 56.1 Resp. ¶ 26. When the elevator opened on the third floor, Madison took plaintiff by her right arm, turned her around, bent her over, slapped and squeezed her buttocks, saying "Mmm" as he did so. Def. 56.1 Stmt. ¶¶ 26-28; Pl. 56.1 Stmt. ¶¶ 26-28; EEOC Tr. at 71:22-72:25, 423:8-19; Beranbaum Decl. Ex. 2 at 33; Small EEOC Dep. Tr. at 43:15-44:13.

Plaintiff and Madison spoke again later that day, first in a short phone call, and then when Madison went to plaintiff's office. Def. 56.1 Stmt. ¶ 29; Pl. 56.1 Resp. ¶ 29. First, at the urging of

her friend and MCC psychologist, Christina Liberati, plaintiff called Madison that day, saying, "I need to talk to you about what you did. [ ] It wasn't right." Pl. 56.1 Resp. ¶ 29; EEOC Tr. at 78:8-79:7. Madison then came to her office, where she was sitting at her desk, put his arm around her, pulled her up, escorted her into the hallway, and then pleaded with her not to report the incident. Pl. 56.1 Resp. ¶ 29; Small Dep. Tr. at 93:5-22. At the EEOC hearing, plaintiff testified that Madison apologized and said "[p]lease don't report it," and "I'll never do that again." Def. 56.1 Stmt. ¶ 30; Pl. 56.1 Resp. ¶ 29; EEOC Tr. at 79:8-80:21.[3]

After the incident, plaintiff reported to work, from October 18, 2013 to November 4, 2013, including voluntary overtime shifts in correctional services on four separate days. Def. 56.1 Stmt. ¶ 31; Pl. 56.1 Resp. ¶ 30. On November 4, 2013, plaintiff reported the incident to Warden Linaweaver, and, prior to that, on October 28, 2013, she reported the incident to the MCC's Equal Employment Opportunity (EEO) Counselor. Def. 56.1 Stmt. ¶ 32; Pl. 56.1 Resp. ¶ 31; EEOC Tr. at 83:25-85:7; Beranbaum Decl. Ex. 2 at 14-16. Later, on November 3, Warden Linaweaver referred plaintiff's complaint to the OIA and directed that a threat assessment be conducted. Def. 56.1 Stmt. ¶ 33; Pl. 56.1 Resp. ¶ 32.

### 5.   MCC's Investigation and Responses

#### a)   *Threat Assessment and Madison's Shift Change*

On November 5, 2013, in response to plaintiff reporting the elevator incident to Warden Linaweaver, a threat assessment team was convened and performed an assessment, which,

---

[3] Plaintiff's 56.1 Response appears to accidentally omit paragraph 30 of Defendant's 56.1 Statement, instead first denying paragraph 29 as not accurately reflecting the evidence, before including a response of "[a]dmitted" untethered to any paragraph number. The Court presumes that plaintiff intended the untethered response to be in response to paragraph 30. More generally, plaintiff's 56.1 Response alternates between properly matching its paragraph numbering to defendant's 56.1 Statement and being off by one on the paragraph numbering. However, it remains clear throughout which paragraph plaintiff intends to respond to.

according to threat assessment team leader, Associate Warden Charleston Iwuagwu, was incomplete as the team failed to interview Madison. Def. 56.1 Stmt. ¶ 34; Pl. 56.1 Resp. ¶ 33; EEOC Tr. at 958:1-8, 992:23-993:8. The threat assessment team submitted a report (the Threat Assessment Report) of their findings and recommendations to Warden Linaweaver on November 19, 2013. Def. 56.1 Stmt. ¶ 35; Pl. 56.1 Resp. ¶ 34; Doud Decl. Ex. L (Dkt. No. 49-12) at 73-77.

The Threat Assessment Report stated that staff were not threatened or exposed to danger but cease and desist letters should be issued to both plaintiff and Madison to avoid further interaction between them, and recommended a further investigation be performed. Def. 56.1 Stmt. ¶ 36; Pl. 56.1 Resp. ¶ 35; Threat Assessment Rep. at 73, 77. Several members of the threat assessment team testified at the EEOC hearing that they were concerned about Small and other female staff continuing to be around Madison, and thus had recommended, in internal threat assessment team meetings, that Madison be placed on home duty and his shift be changed to avoid contact with plaintiff, even though those recommendations did not make it into the Threat Assessment Report. Pl. 56.1 Resp. ¶¶ 34-35; EEOC Tr. at 586:3-587:2, 590:1-594:8, 602:10-603:2, 609:1-20, 965:14-971:25. Consistent with the recommendations in the Threat Assessment Report, cease and desist memoranda were issued to Madison on November 6, 2013, and Small on January 10, 2014. Def. 56.1 Stmt. ¶ 37; Pl. 56.1 Resp. ¶ 36; Doud Decl. Ex. L at 79; *id*. Ex. C at 165.

The cease and desist memoranda were intended to prevent plaintiff and Madison from coming into contact and interfering with ongoing investigations, and to ensure both could continue to perform their jobs. Def. 56.1 Stmt. ¶ 38; Pl. 56.1 Stmt. ¶ 37. Covington testified that he "would believe that it [the cease and desist memorandum] would be" maintained in plaintiff's personnel file for an unknown number of months or years and could be used as a record in any

future incidents; however, he did not know this for a fact. Pl. 56.1 Resp. ¶ 38; EEOC Tr. at 652:9-653:13. Latham, the Human Resources Manager, testified that cease and desist letters are not maintained in personnel records. Latham Supp. Decl. ¶¶ 3-4.[4]

Madison was off duty, using a combination of sick leave, days off, annual leave, and holiday leave, or on special assignment (working in the phone room and emergency preparedness office) from November 2, 2013 until January 12, 2014 when he returned to his regular duties as activities lieutenant. Def. 56.1 Stmt. ¶¶ 42-43; Pl. 56.1 Resp. ¶¶ 41-42; Doud Decl. Ex. P (Dkt. No. 49-16) at 22-23; EEOC Tr. at 1230:4-1234:5. When Madison returned to his regular duties, he was moved to a different shift (the evening shift), to reduce potential overlap with plaintiff, although plaintiff still saw Madison at least twice a week following the shift change. Def. 56.1 Stmt. ¶ 40, 43; Pl. 56.1 Resp. ¶ 39, 42; EEOC Tr. at 136:7-137:3, 1320:5-16, 1322:21-24.

Additionally, on November 10, 2013, plaintiff took a 45-day medical leave of absence, due to emotional distress from Madison's assault, which was made worse because everyone at MCC knew about the incident and asked her questions about it, including inmates. Def. 56.1 Stmt. ¶ 41; Pl. 56.1 Resp. ¶ 40; EEOC Tr. at 114:24-115:15; Beranbaum Decl. Ex. 25 (Dkt. No. 59-30) at 3-4; Doud Decl. Ex. B (Dkt. No. 49-2) at 718:21-719:12. After the October 2013 incident, plaintiff's communications with Madison were limited. They talked a few times on the phone, but only when Madison called plaintiff's department to let them know overtime was available and plaintiff answered the phone, or when plaintiff initiated calls to see if there was overtime available, with the conversations limited to discussing the overtime post available. Def.

---

[4] Covington's testimony on this point, couched explicitly in speculative language, "is not admissible, because it is simply speculation," and "the Court can only rely upon admissible evidence in the context of summary judgment." *Kiefer v. Crane Co.*, 2014 WL 6778704, at *3 (S.D.N.Y. Feb. 3, 2014). Accordingly, there is not a genuine issue of fact.

56.1 Stmt. ¶ 48; Pl. 56.1 Resp. ¶ 47; Beranbaum Decl. Ex. 9 (Dkt. No. 59-12) (Madison EEOC Dep. Tr.) at 85:17-87:16.

In February 2014, plaintiff was assigned to Correctional Services for two weeks while staff participated in annual training. Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Resp. ¶ 43. During that entire two-week period, Madison worked the same shift as plaintiff and was her supervisor, but he was instructed to make arrangements for the other lieutenant on duty to make rounds, and to avoid interaction with plaintiff, which was successful as plaintiff did not see or speak to Madison at any point during the two-week assignment. Def. 56.1 Stmt. ¶¶ 45-47; Pl. 56.1 Resp. ¶¶ 44-46; Small Dep. Tr. at 154:6-155:18; EEOC Tr. at 133:2-135:4, 728:10-729:15.

Plaintiff is unable to identify any specific instances after February 2014 when Madison was one of the lieutenants on duty while she was assigned to a custody post. She testified that she's "pretty sure that it happened," but did not know "the exact dates." Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Resp. ¶ 48; Small Dep. Tr. at 159:6-17, 188:15-189:7. Madison has not made rounds in plaintiff's unit at any point since the October 2013 incident, except when responding to body alarms on two or three occasions. Def. 56.1 Stmt. ¶ 50; Pl. 56.1 Resp. ¶ 49; Madison EEOC Dep. Tr. at 92:2-93:7; EEOC Tr. at 347:7-348:2. Madison has not behaved inappropriately towards plaintiff at any point since the October 2013 incident. Def. 56.1 Stmt. ¶ 51; Pl. 56.1 Resp. ¶ 50.

### b)   *OIA Investigation*

In addition to the threat assessment, an internal investigation of the October 2013 incident was conducted by Special Investigative Agent Mary Wade-Jones with the OIA, on referral from Warden Linaweaver. Def. 56.1 Stmt. ¶¶ 52-55; Pl. 56.1 Resp. ¶¶ 51-54.

Madison told Wade-Jones that plaintiff had previously sent him several emails and photographs that were sexual in nature. Def. 56.1 Stmt. ¶ 56; Pl. 56.1 Resp. ¶ 55. Wade-Jones recounted this in an email to Brian Barrick (an OIA Special Agent), reporting that Madison

alleged that plaintiff made "several sexual advances" towards him, sent him several explicit emails and photographs of herself, and that she had been doing so for a year, with the emails and photographs stored on his hard drive. Pl. 56.1 Resp. ¶ 55; Beranbaum Decl. Ex. 30 (Dkt. No. 59-35). Further, Madison informed Wade-Jones that he believed plaintiff had asked a computer services employee to erase the information from his hard drive. Pl. 56.1 Resp. ¶ 55; Beranbaum Decl. Ex. 30. In a sworn statement to Wade-Jones, Madison also reported that plaintiff sent him "valentine lollipop grams," and emails that were "flirtations." Def. 56.1 Stmt. ¶ 57; Pl. 56.1 Resp. ¶ 56.

Based on these reports from Madison, Wade-Jones obtained approval for, and conducted, an email search. Def. 56.1 Stmt. ¶ 58; Pl. 56.1 Resp. ¶ 57. The search uncovered two non-work-related email chains between plaintiff and Madison, sent on the BOP system on July 16, 2013. Def. 56.1 Stmt. ¶ 59; Pl. 56.1 Resp. ¶ 58. In the first of the two chains, plaintiff sent an email to Madison, stating, "AWWWWWW I just heard the sweetest thing I am very flattered, I went to Brooklyn today and a very nice neighbor of mine told me that someone here, who is a lt. has a crush on me :) :) :)." Def. 56.1 Stmt. ¶ 60; Pl. 56.1 Resp. ¶ 59 (grammar as in the original). Madison responded to that email with, "LOL, I [sic] going to smack the HELL out of hear [sic]. :)." *Id.* (grammar as in the original.) In another email, Madison told plaintiff, "DON'T GET SPOOKED!" to which Small responded, "nope I'm not if you and i [sic] were single boy oh boy," to which Madison responded, "DAM, I no [sic] baby." *Id.* (grammar as in the original.) Plaintiff also emailed a photograph of herself to Madison, in which she was wearing a dress below her knees at an office party. Def. 56.1 Stmt. ¶ 61; Pl. 56.1 Resp. ¶ 60. The photograph is a normal picture of plaintiff smiling. Doud Decl. Ex. L at 68.

Wade-Jones completed her investigation on April 7, 2014 and concluded that Madison had inappropriately touched plaintiff's buttocks. Def. 56.1 Stmt. ¶¶ 62-63; Pl. 56.1 Resp. ¶¶ 61-63. Wade-Jones also found, based on the non-work-related emails that plaintiff and Madison exchanged via BOP computers, that both had misused government computers in violation of the Standards of Employee Conduct. Def. 56.1 Stmt. ¶ 64; Pl. 56.1 Resp. ¶ 64.[5]

The BOP Standards of Employee Conduct provide that government property is to be used for authorized purposes only. However, "authorized purposes" include "personal use of Government office equipment such as computers," provided there is only a "negligible cost to the Government." Def. 56.1 Stmt. ¶ 65; Pl. 56.1 Resp. ¶ 65; Standards of Employee Conduct at 12.[6] Emails of a sexually explicit nature violate the policy, even if the number of emails exchanged is *de minimis*. Def. 56.1 Stmt. ¶ 66; Pl. 56.1 Resp. ¶ 66.[7]

Wade-Jones further concluded that plaintiff had exhibited a lack of candor, because she initially denied sending a photograph of herself to Madison. Def. 56.1 Stmt. ¶ 67; Pl. 56.1 Resp. ¶ 67. When Wade-Jones confronted her with the picture, plaintiff responded that she had simply forgotten about it, given that the email was sent over a year ago. Pl. 56.1 Resp. ¶ 56; EEOC Tr. 153:11-24. Barrick reviewed Wade-Jones's investigation and directed her to remove the

---

[5] Plaintiff attempts to dispute this, contending that the executive summary from Wade-Jones stated only that plaintiff, not Madison, had misused a government computer. Pl. 56.1 Resp. ¶ 64. In fact, the executive summary clearly states that the investigation revealed sufficient evidence that "Madison inappropriately touched Small's buttocks and misused a government computer." Doud Decl. Ex. L at 7. Accordingly, this is not a genuine dispute.

[6] At the EEOC hearing, Linaweaver testified that she had received personal emails on a government computer, and explained that in determining whether the personal use is *de minimis*, the issue is how the employee responds to those emails. According to Linaweaver, responding with a one line email is *de minimis* use, but four pages of personal greetings would be abuse. EEOC Tr. at 721:4-722:5.

[7] There is no evidence in the record that any "emails of a sexually explicit nature" were exchanged between Madison and plaintiff.

proposed finding against plaintiff for lack of candor as there was insufficient evidence that plaintiff had been purposefully deceitful. Def. 56.1 Stmt. ¶¶ 68-69; Pl. 56.1 Resp. ¶¶ 68-69.

The OIA sustained the charges against Madison for unprofessional conduct of a sexual nature and against both Madison and plaintiff for misuse of government computers. Def. 56.1 Stmt. ¶ 70; Pl. 56.1 Resp. ¶ 70.

### c)   2016 Disciplinary Action Against Plaintiff and Madison

On April 12, 2016, over two years after Wade-Jones completed her investigation, plaintiff's supervisor issued a letter recommending that she be suspended for three days for misuse of a government computer, and explained that the Warden would make the final decision on the proposed discipline. Def. 56.1 Stmt. ¶ 71; Pl. 56.1 Resp. ¶ 72. Plaintiff's counsel objected to the proposed three-day suspension on the grounds that plaintiff had used government computers for personal reasons just twice in over two years, a negligible amount; the disciplinary action was retaliatory for plaintiff's sexual harassment complaints; the proposed three-day suspension was so delayed (over two years after the investigative report) as to be punitive; and the three-day suspension conflicted with the standards promulgated by the Merit Systems Protection Board with respect to federal employee misconduct. Def. 56.1 Stmt. ¶ 72; Pl. 56.1 Resp. ¶ 73; Beranbaum Decl. Ex. 31 (Dkt. No. 59-36). The Warden at the time, Tatum, made the final disciplinary determination on September 6, 2016, electing not to suspend plaintiff but instead issuing her a letter of reprimand. Def. 56.1 Stmt. ¶ 72; Pl. 56.1 Resp. ¶ 73. The letter of reprimand was to be removed from plaintiff's personnel file after no more than two years. Def. 56.1 Stmt. ¶ 73; Pl. 56.1 Resp. ¶ 74.

On October 19, 2016, based on the October 2013 elevator incident, the exchange of non-work-related emails with plaintiff, and a March 5, 2014 incident in which Madison attempted to enter MCC with his personal firearm in his bag, Madison's supervisor recommended that he be

removed from his position. Def. 56.1 Stmt. ¶ 74; Pl. 56.1 Resp. ¶ 75. On May 8, 2017, Warden Tatum issued an adverse action letter to Madison, stating that he found the charges against Madison supported by the evidence, and had decided to suspend Madison for thirty days. Def. 56.1 Stmt. ¶ 75; Pl. 56.1 Resp. ¶ 76. Warden Tatum testified at his deposition that he elected not to terminate Madison because he had a good work record, there had not been any further incident, and Madison had taken responsibility for his actions. Def. 56.1 Stmt. ¶ 76; Pl. 56.1 Resp. ¶ 77; Doud Decl. Ex. I (Dkt. No. 49-9) at 78:8-79:13. However, through the BOP investigation and at his EEOC deposition (on February 10, 2017), Madison continued to deny that the October 2013 elevator incident occurred, rather than take responsibility for it. Pl. 56.1 Resp. ¶ 77; Madison EEOC Dep. Tr. at 1, 39:17-41:4; Doud Decl. Ex. L at 31.

### 6.      Plaintiff's Applications for Promotions

Between plaintiff reporting the October 2013 incident and the filing of this lawsuit on June 21, 2018, plaintiff applied for 23 positions at the BOP, all of which would have been promotions or had the potential for promotion to a higher GS level. Def. 56.1 Stmt. ¶ 80; Pl. 56.1 Resp. ¶ 81. On July 19, 2016, she was selected for a promotion to a Correctional Systems Officer, a GS-8 position, effective September 4, 2016. Def. 56.1 Stmt. ¶ 5; Pl. 56.1 Resp. ¶ 5.

When a job opening at the BOP is posted, applications are submitted to the USA Jobs website, and then transmitted to the BOP's consolidated human resources processing office in Grand Prairie, Texas, which determines which applicants are qualified for the job and compiles a list of "best qualified" applicants, as well as a list of applicants who are excepted from merit-based promotion processes because they already hold, or have held, a position at the same level. Def. 56.1 Stmt. ¶¶ 77-78; Pl. 56.1 Resp. ¶¶ 78-79. Those lists are then provided to the appropriate personnel at the facility where the position is located, at which point facility

personnel may perform reference checks, or vouchering, using a prescribed form. Def. 56.1 Stmt. ¶ 79; Pl. 56.1 Resp. ¶ 80.

Of the 23 positions plaintiff applied for during the relevant time period, she was on the "best qualified" list for eight of them, and the "exception to merit promotion" list for two. Def. 56.1 Stmt. ¶ 81; Pl. 56.1 Resp. ¶ 81. The first selection decision for a position for which plaintiff was on the "best qualified" list and not selected was made on October 20, 2014, more than 11 months after she reported the October 2013 incident; 18 other BOP employees were identified as eligible for that position. Def. 56.1 Stmt. ¶¶ 82-83; Pl. 56.1. Resp. ¶¶ 82-83. The next selection decision where plaintiff was on the "best qualified" list but not selected was made on May 26, 2015; 27 other employees were identified as eligible for that position. Def. 56.1 Stmt. ¶ 84; Pl. 56.1 Resp. ¶ 84. No further details are provided with respect to these two positions.

Thomas Bergami and Herman Quay and were the selecting officials for two additional positions that plaintiff unsuccessfully applied for. Def. 56.1 Stmt. ¶¶ 86, 90; Pl. 56.1 Resp. ¶¶ 86, 89. Bergami, the Associate Warden at Metropolitan Detention Center in Brooklyn (MDC) from 2014 to 2016, was the selecting official in 2015 for a position for which plaintiff applied and was not selected. Def. 56.1 Stmt. ¶ 86; Pl. 56.1 Resp. ¶ 86. For that position, nine employees (including plaintiff) were on the "best qualified list" and 11 more were on the "exception to merit" list or the disabled veterans preference list. Def. 56.1 Stmt. ¶ 87; Pl. 56.1 Resp. ¶ 86. In making the selection, Bergami was unaware of whether there was any EEO activity by any of the applicants, as the information was not provided or considered in the selection process, but Bergami did not know whether or not the two officials who conducted plaintiff's reference check learned about her prior EEO activity. Def. 56.1 Stmt. ¶ 88; Pl. 56.1 Resp. ¶ 87; Doud Decl. Ex. V (Dkt. No. 49-22) at 4-5. Bergami selected the person for the position who he determined would

20

be the best fit for the open position and who he believed was more qualified for the job than plaintiff or any other applicant. Def. 56.1 Stmt. ¶ 89; Pl. 56.1 Stmt. ¶ 88.

Quay, the Warden at the MDC from December 2015 through May 2019, was the selecting official in 2016 for a position for which plaintiff applied but was not selected. Def. 56.1 Stmt. ¶ 90; Pl. 56.1 Resp. ¶ 89. For that position, 10 employees, including plaintiff were on the "best qualified" list and another 11 were on the "exception to merit" list. Def. 56.1 Stmt. ¶ 91; Pl. 56.1 Resp. ¶ 90. Quay selected "several individuals" for the position to which plaintiff applied, all of whom were already working at MDC at the time they received their promotions. Def. 56.1 Stmt. ¶ 92; Pl. 56.1 Stmt. ¶ 91.[8] During his 24 years working for the BOP, Quay never heard the issue of whether an applicant has filed an EEO or any other sort of complaint raised in connection with the BOP's reference checking process for promotions. Def. 56.1 Stmt. ¶ 93; Pl. 56.1 Resp. ¶ 92.[9]

Tatum selected plaintiff for the promotion she received in 2016. Def. 56.1 Stmt. ¶ 94; Pl. 56.1 Resp. ¶ 93. During his 26-year career with the BOP, he was not aware of any instance in which the issue of whether an applicant had made an EEO complaint came up in connection with any selection process in which he was involved. Def. 56.1 Stmt. ¶ 95; Pl. 56.1 Resp. ¶ 94.

---

[8] Plaintiff denies this assertion, stating that "there were seven individuals . . . selected for the job." Pl. 56.1 Resp. ¶ 91. This does not appear to be a dispute of fact, much less a material fact, since "several individuals" is not inconsistent with "seven individuals."

[9] Plaintiff points out that a report issued in 2010 by the EEOC identified the BOP practice of "vouchering," whereby the hiring supervisor speaks with an employee's current or past supervisors and learns of the employee's past EEO activity, "result[ing] in employees' fear that if they filed an EEO complaint they will never be promoted." Pl. 56.1 Resp. ¶ 92; Beranbaum Decl. Ex. 8 (Dkt. No. 59-11) (2010 EEOC Rpt.). However, plaintiff does not deny Quay's testimony or otherwise or argue that her EEO activity was discovered in the manner described in the 2010 EEOC Report.

Neither party points to any of plaintiff's other job applications as relevant to the summary judgment motion.

### 7.    Work Environment After Plaintiff Reported October 2013 Incident

Plaintiff alleges that she was subject to retaliatory harassment from coworkers at MCC after she reported the October 2013 incident. On March 7, 2014 she submitted a letter to Regional Director Norwood in which she stated, *inter alia*, that "[s]ince I have reported the sexual assault I have been outcast and retaliated against." Def. 56.1 Stmt. ¶ 106; Pl. 56.1 Resp. ¶ 106. Norwood never responded to her. Pl. 56.1 Resp. ¶ 106; EEOC Tr. at 167:22-168:9. Her letter was forwarded to Executive Assistant Lewis (who also served as MCC's human resources manager), who met with plaintiff twice to discuss her concerns. Def. 56.1 Stmt. ¶ 107; Pl. 56.1 Resp. ¶ 107; EEOC Tr. at 672:22-673:9.

During the meetings between plaintiff and Lewis on March 14 and 17, 2014, plaintiff did not identify any specific staff members who had retaliated against her, or any specific instances of co-worker retaliation. Def. 56.1 Stmt. ¶ 108; Pl. 56.1 Resp. ¶ 108. Lewis's report does not indicate whether plaintiff was specifically asked to identify specific staff members. Pl. 56.1 Resp. ¶ 108; Doud Decl. Ex. Y (Dkt. No. 49-25).

Plaintiff's March 7, 2014 letter also referenced the incident on March 5, 2014, when Madison attempted to bring his personal firearm into the MCC facility, stating "I feel as if Lt. C. Madison's attempt to introduce a loaded firearm into the institution was a direct attempt to physically harm me." Def. 56.1 Stmt. ¶ 109; Pl. 56.1 Resp. ¶ 109. The BOP's Office of the Inspector General (OIG) investigated that incident, examined whether it had any connection to plaintiff, and did not find any evidence that it did. Def. 56.1 Stmt. ¶ 110; Pl. 56.1 Resp. ¶ 110.

Several instances of conduct that plaintiff characterizes as retaliatory harassment by coworkers occurred following plaintiff's report of the October 2013 incident. Beginning in 2014,

one coworker would not let her heat up her food, although he did not say anything to her about the incident with Madison when he prevented her from doing so (it is unclear whether he prevented her from doing so once or multiple times). Def. 56.1 Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111; Small Dep. Tr. at 134:13-16, 135:16-136:6.

On two occasions when plaintiff was in the elevator, it inexplicably went up to the inmate recreation area on the roof, which she would have no cause to visit and where she was left for an unspecified period of time. Def. 56.1 Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111; Small Dep. Tr. at 133:14-134:21. Plaintiff describes these incidents as "[j]ust dumb things." Small Dep. Tr. at 134:18-135:7. Other times, when she was waiting for the elevator, the person controlling it would deliberately skip floors where she was waiting. Def. 56.1 Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111; Small Dep. Tr. at 133:9-135:15. The record does not contain further details or specific instances of this occurring.

Plaintiff also thought there were instances where her name was skipped when employees were called for overtime or her overtime pay was improperly calculated, though she did not know when that occurred and did not identify who was responsible. Def. 56.1. Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111. Further, there was an incident where she was not paid for about 30 overtime shifts, which required her to request a review by the Associate Warden. Pl. 56.1 Resp. ¶ 111; Small Dep. Tr. at 138:25-139:20. The Associate Warden was "surprised" to discover the issue, and then opened "this whole big thing" and did "some review" on her chart, after which she was paid all money owed. Small Dep. Tr. at 139:15-140:4. Plaintiff was not given an explanation of what caused the underlying issue and speculated at her deposition that someone was ripping up the papers reflecting her overtime. *Id*. at 140:5-14.

Certain coworkers stopped saying hello to plaintiff, although at deposition, she could not remember who, explaining that people "just [weren't] talking to me." Def. 56.1. Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111; Small Dep. Tr. at 133:9-135:15. Plaintiff also describes three instances of improper comments being made to her. In one instance, she was standing in an elevator and an officer told the people there, "Hands up, we wouldn't want any problems on the elevator." Pl. 56.1 Resp. ¶ 111; Small EEOC Dep. Tr. at 113:4-11. In another instance, four officers said to her, "I heard those videos are real good," apparently referencing a rumor in the institution that she was sending pornographic videos and naked pictures of herself to others at the institution. Pl. 56.1 Resp. ¶ 111; Small EEOC Dep. Tr. at 113:16-23. Finally, in another instance, Officer Mack Rose told incoming employees, "Don't talk to her. That's the sexual harassment girl. [ ] She'll report you." Pl. 56.1 Resp. ¶ 111; EEOC Tr. at 170:8-18, 321:12-322:20.

Plaintiff does not allege any other instances of harassment after she reported the October 2013 incident.

### 8.    EEOC Proceedings

Plaintiff made initial contact with an EEO counselor on October 28, 2013. Def. 56.1 Stmt. ¶ 112; Pl. 56.1 Resp. ¶ 112. She filed a formal Complaint of Discrimination on January 30, 2014. Def. 56.1 Stmt. ¶ 113; Pl. 56.1 Resp. ¶ 113; Doud Decl. Ex. C at ECF page 5 (EEO Complaint). On the form, when asked why she believed she was discriminated against, plaintiff checked boxes marked "Sex," "Female," and "Sexual Harassment." She also wrote, "See attached document." However, neither plaintiff nor defendant has supplied the attached document to the Court. Plaintiff amended her EEO Complaint on February 24, 2014 and April 1, 2014, to add retaliation claims. Def. 56.1 Stmt. ¶ 115; Pl. 56.1 Resp. ¶ 115.

Although the record in this case does not include the attachment to plaintiff's original EEO Complaint, or her amendments, her claims before the EEOC were summarized by EEO Officer Mina Raskin on May 14, 2014, as follows:

- On October 18, 2013, you allege that you were subjected to sexual harassment when the Lieutenant [Madison] grabbed and squeezed your buttocks as he exited the elevator. Additionally, you allege that the Lieutenant came to your office later that day, telling you not to report the incident. (***Original allegation***)

- On January 10, 2014, you allege that you were issued a Cease and Desist letter and informed that the Lieutenant would not be scheduled on the same shift with you. However, he was Activities Lieutenant on evening watching during your scheduled shift. (***Amended allegation***)

- On March 10, 2014, you allege that you were referred for Special Investigative Services (SIS) investigation for Lack of Candor and Misuse of Computer. (***Amended allegation***)

Doud Decl. Ex. C at 21-23. It thus appears that plaintiff's harassment claim, as presented to the EEOC, was limited to the October 2013 elevator incident and Madison's visit to her office later that day.

An evidentiary hearing was held before AJ Monique Roberts of the EEOC on January 30 and 31 and February 1, 2, 3, 4, and 10, 2017. Def. 56.1 Stmt. ¶ 116; Pl. 56.1 Resp. ¶ 116; *see also* Doud Decl. Ex. M (Dkt. No. 49-13) (AJ Decision) at 2.[10] On August 31, 2017, AJ Roberts issued a written decision in favor of the BOP. *Id*. at 17.[11] Plaintiff's counsel did not receive the

---

[10] In her Rule 56.1 response, plaintiff disputes this, contending that the hearing took six, not seven days, and that there was no hearing on February 4, 2017. Pl. 56.1 Resp. ¶ 116. However, she does not cite to any evidence in the record to support that contention, which is at odds with the AJ Decision. In any event, this is not a material dispute.

[11] The AJ Decision, like the earlier letter from EEO Officer Raskin, describes plaintiff's claim of sexual harassment as limited to the October 18, 2013 elevator incident and Madison's visit to her office later that day. AJ Dec. at 2. There is no discussion, anywhere in the 17-page decision, of any allegation by plaintiff that she was subject to sexual harassment before – or after – that date.

AJ Decision until February 22, 2018. Def. 56.1 Stmt. ¶ 117; Pl. 56.1 Resp. ¶ 117. On March 23, 2018, the Complaint Adjudication Officer issued the DOJ's Final Order upholding the AJ Decision, as well as a Memorandum Explaining the Final Order. Def. 56.1 Stmt. ¶ 118; Pl. 56.1 Resp. ¶ 118; Doud Decl. Ex. Z (Dkt. No. 49-26).

### B.     Procedural History

Plaintiff filed this action on June 21, 2018. (Dkt. No. 1.) On December 12, 2018, the parties consented to my jurisdiction for all purposes. (Dkt. No. 23.) Following the completion of discovery, defendant moved for summary judgment on September 20, 2019. (Dkt. Nos. 48-52.) Plaintiff filed her opposition papers on November 17, 2019. (Dkt. Nos. 59-61.) Defendant filed his reply papers on December 6, 2019. (Dkt. Nos. 64-66.)

## II.     DISCUSSION

### A.     Legal Standards

#### 1.     Summary Judgment Standards

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 128-29 (2d Cir. 1996). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 322; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). In evaluating the record, the court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008).

If the moving party meets his initial burden, the burden then shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex,* 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). The non-moving party must present specific, admissible evidence in support of his contention that there is a genuine dispute as to the material facts. *Celotex,* 477 U.S. at 324; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful"). Furthermore, the evidence must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 242, 248. Thus, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996).

In this District, these principles are incorporated into Local Civil Rule 56.1, which requires that a party moving for summary judgment submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." The opposing party must specifically controvert each numbered paragraph of the movant's statement in a corresponding paragraph of its own. Local Civil Rule 56.1(c). If the opposing party fails to do so, that paragraph is deemed admitted. *Id.*; *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (if the non-moving party fails to submit a Rule 56.1 counter-statement, all material facts offered by the movant, if supported by the record, will be deemed admitted); *Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) ("If a party opposing a motion for summary judgment does not submit a Rule 56.1 Statement, the factual assertions contained in the movant's Statement are deemed admitted and uncontroverted."). Each statement by the moving or opposing party,

"including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local Civil Rule 56.1(d). "A genuine dispute of fact does not exist merely because a litigant makes conclusory allegations to raise a dispute, particularly if the underlying evidence contradicts the litigant's assertion." *Blue v. City of New York*, 2018 WL 1136613, at *2 (S.D.N.Y. Mar. 1, 2018). Thus, where a plaintiff disputes a fact asserted by the moving defendant, courts considered whether the plaintiff cites to admissible evidence and whether the cited evidence supports the plaintiff's assertion. *Id*.

### 2.    Sexual Harassment

"Title VII prohibits an employer from 'discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, privileges of employment, because of,' *inter alia*, 'such individual's . . . sex.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174-75 (2d Cir. 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)). "A plaintiff seeking relief for sex discrimination can proceed under two theories: (1) 'quid pro quo' and (2) 'hostile work environment.'" *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir. 1992).[12]

"In order to prevail on a claim that sexual harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements." *Howley v. Town Stratford*, 217 F.3d 141, 153 (2d Cir. 2000). "First, the plaintiff must show that the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)).

---

[12] As defendant notes, plaintiff "does not contend that she suffered quid pro quo sexual harassment." Defendant's Memorandum of Law in Support of Motion for Summary Judgment (Dkt. No. 51) (Def. Mem.) at 17.

"Second, the plaintiff must show that 'a specific basis exists for imputing the conduct that created the hostile work environment to the employer.'" *Howley*, 217 F.3d at 153 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

### a) *Administrative Exhaustion*

"Before bringing a Title VII action in the district court, an aggrieved employee is required to exhaust [her] administrative remedies." *Fernandez v. Chertoff*, 471 F.3d 45, 54 (2d Cir. 2006). "A court may only entertain Title VII claims that were raised in or are reasonably related to the claims in the plaintiff's EEOC charge." *Fleming v. Verizon N.Y., Inc.*, 419 F. Supp. 2d 455, 462 (S.D.N.Y. 2005) (citing *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)). "The Second Circuit has recognized only three circumstances in which claims not alleged in an EEOC charge are sufficiently related to the charge to be asserted in the civil action: (1) where the claim concerns conduct that would fall within the scope of the EEOC investigation that can reasonably be expected to grow out of the charge; (2) where the claim alleges retaliation for filing the EEOC charge; or (3) where the claim concerns further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (citation omitted)). "[T]he burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense." *Hardaway v. Hartford Public Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018). Additionally, "discrete prior acts" not timely alleged in an EEOC charge may nonetheless, in an appropriate case, "be used as 'background evidence in support of a timely claim.'" *Cusher v. Mallick*, 2020 WL 109510, at *13 (N.D.N.Y. Jan. 9, 2020) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

### b)       Severe and Pervasive Discrimination

As to the first element, the kinds of conduct that may be actionable as sexual harassment include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Redd*, 678 F.3d at 175 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* (quoting *Harris*, 510 U.S. at 23).

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23. A plaintiff "need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd*, 678 F.3d at 175 (quoting *Pucino v. Verizon Communications, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in the original)).

"[D]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Redd*, 678 F.3d at 177. (quoting *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001)). A single instance of intentional groping can defeat a motion for summary judgment as to a hostile work environment claim. *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 663 (E.D.N.Y. 2015) (finding that a single incident where a co-worker "made direct contact with . . . [plaintiff's] buttock was sufficient to constitute the creation of a hostile work environment"); *Stathatos v. Gala Resources, LLC*, 2010 WL 2024967, at *5 (S.D.N.Y. May 21, 2010) (finding that plaintiff's allegation that a coworker "intentionally groped her buttocks can alone defeat defendants' motion for summary judgment").

30

However, "Title VII is not 'a general civility code.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (citation and internal quotation marks omitted)). "The incidents of allegedly offensive conduct must also be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id*. (quoting *Perry*, 115 F.3d at 149 (citation and internal quotation marks omitted)).

### c)    *Imputing Conduct to Employer*

As to the second element, "[w]here the hostile environment is created by a nonsupervisory coworker, the employer is liable only if it was negligent in controlling the working conditions." *Hoag v. Fallsburg Central School Dist.*, 279 F. Supp. 3d 465, 480 (S.D.N.Y. 2017) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). "An employee is considered a supervisor 'only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a change in benefits.'" *Id*. (quoting *Vance*, 570 U.S. at 431-32). "The employer's vicarious liability for nonsupervisory coworkers depends on a showing that the employer knew, or reasonably should have known, about the harassment but failed to take appropriate remedial action." *Id*. (citing *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004)). "The appropriateness of an employer's action must be assessed from the totality of the circumstances." *Id*. (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014) (internal quotation marks omitted)).

However, where the harasser is a supervisor, "[i]f the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense: (1) that the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424.

### 3. Retaliation

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "First, the plaintiff must establish a *prima facie* case," by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id*. (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001)). At the summary judgment stage, the burden of proof for a *prima facie* case "has been characterized as 'minimal' and *'de minimis*.'" *Id*. (quoting *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005)) (internal quotation marks omitted). The Court's role in determining whether this initial burden is satisfied at the summary judgment stage is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*.

If the plaintiff sustains the initial burden, a presumption of retaliation arises and then the "onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. "Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the employment action." *Id*.

"To establish an adverse employment action for purposes of a retaliation claim, '[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 224 (E.D.N.Y. 2014) (quoting *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010)). "The anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" *Fincher*, 604 F.3d at 721 (quoting *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 68 (2006)). Further, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

As to proof of causation, that can be shown either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

"[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow

for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases).

### 4.    Retaliatory Harassment

"To establish alleged retaliatory harassment by a co-worker, a Title VII plaintiff must prove, among other things, that (i) the alleged retaliatory harassment was sufficiently severe to constitute an adverse change in the terms and conditions of her employment, and (ii) her employer knew about but failed to take action to abate the retaliatory harassment." *Brown v. Henderson*, 115 F. Supp. 2d 445, 451 (S.D.N.Y. 2000). The plaintiff must "satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous or concerted to have altered the conditions of [her] employment." *Hahn v. Bank of America Inc.*, 2014 WL 1285421, at *22 (S.D.N.Y. Mar. 31, 2014) (quoting *Rasco v. BT Radianz*, 2009 WL 690986, at *15 (S.D.N.Y. Mar. 17, 2009)), *aff'd* 607 F. App'x 55 (2d Cir. 2015).

### B.    Analysis

### 1.    Sexual Harassment Claim

#### a)    *Administrative Exhaustion*

As a threshold matter, the parties dispute the scope of plaintiff's sexual harassment claim properly before this Court. Defendant contends that to the extent the claim is based on conduct other than the October 18, 2013 assault by Madison, plaintiff failed to exhaust it at the EEOC, because her allegations there extended only to the elevator incident, and because her "sexualized workplace" allegations, which involve conduct by other actors, are not sufficiently related to her EEOC charge to be asserted herein. Def. Mem. at 16-17. Under *Fleming*, the question is whether these broader allegations concern "conduct that would fall within the scope of the EEOC investigation" and that could be reasonably expected to grow out of the charge she filed

34

regarding the sexual assault. 419 F. Supp. 2d at 462. Here, plaintiff argues that the allegations in her Complaint are reasonably related to her EEOC charge because "a reasonable investigator examining a situation in which a male superior officer slapped and grabbed a female subordinate's buttocks would ask what conditions – both at the institution and in their relationship – led to such brazenly inappropriate behavior." *Id*. a 21-22.[13]

This is, in many ways, an academic dispute, because, as discussed in § II(B)(1)(b) below, the October 18, 2013 assault alone is sufficient for a reasonable jury to conclude that plaintiff was subject to a hostile work environment. Nonetheless, I conclude that, to the extent plaintiff's allegations encompass other conduct by Madison, those allegations could reasonably be expected to grow out of her EEOC charge. Her broader allegations of a sexualized workplace, however, were not implicated by her EEOC charge (and even if they were properly raised before the EEOC, they do not rise to the level of severity that supports a hostile work environment claim).

Plaintiff's EEOC charge focused on the elevator incident with Madison, and was thereafter amended to include retaliation stemming from her filing a formal complaint about the incident. *See* Doud Decl. Ex. C at 21-23; AJ Dec. at 1-2.[14]

---

[13] Plaintiff also argues that defendant is estopped from asserting its exhaustion defense because the BOP did not object to evidence of the sexualized work environment being introduced at the EEOC hearing. Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment (Dkt. No. 60) (Pl. Mem.) at 19-20. This argument is without merit. A party is estopped from raising a defense "that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided." *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir. 1992) (citation omitted), *cert. denied*, 506 U.S. 1053 (1999). A failure-to-exhaust argument can only be made – and thus can only be waived – in federal district court. Plaintiff provides no case law, and the Court was unable to locate any, that supports the novel theory that not objecting to the admission of evidence at an EEOC hearing can estop the non-objecting party from raising a failure-to-exhaust defense in a later civil suit.

[14] Plaintiff does not dispute that the letter from EEO Officer Raskin and the AJ Decision accurately summarize her EEOC charge and amendments thereto. *See* Pl. Mem. at 20-22.

Many of plaintiff's allegations relate specifically to arguably inappropriate behavior by Madison, including that they would greet each other with a hug and a kiss, which made plaintiff uncomfortable, Def. 56.1 Stmt. ¶ 99; Pl. 56.1 Resp. ¶ 99; that Madison would comment on her having a "big rear end," as well as on other female coworkers' appearances, Def. 56.1 Stmt. ¶ 101; Pl. 56.1 Resp. ¶ 101; that Madison made unwanted sexual advances towards her, Def. 56.1 Stmt. ¶ 103; Pl. 56.1 Resp. ¶ 103; and that there were rumors that plaintiff sent explicit photographs of herself to Madison. Def. 56.1 Stmt. ¶ 105; Pl. 56.1 Resp. ¶ 105. I conclude that because these incidents concern the same individual implicated by the EEOC charge, and are similar in nature to the behavior alleged in the EEOC charge, they "fall within the scope of the EEOC investigation that can reasonably be expected to grow out of the charge." *Fleming*, 419 F. Supp. 2d at 462. *See Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 163 (2d Cir. 2001) (finding that an investigation following an EEOC charge of discrimination involving a specific individual "could reasonably be expected to inquire into other instances of alleged discrimination by the same actor"). Even if plaintiff did not administratively exhaust her claims based on allegations against Madison beyond the elevator incident, evidence of that conduct could be admissible as "discrete prior acts," which "may be used as 'background evidence in support of a timely claim.'" *Cusher*, 2020 WL 109510, at *13 (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113).

I come to a different conclusion with respect to plaintiff's allegations against other employees. To accept her argument that a reasonable investigator examining a situation where an individual grabbed another individual's buttocks would "ask what conditions . . . at the institution . . . led to such brazenly inappropriate behavior," Pl. Mem. at 21-22, would be to create an exception that would swallow the rule. In effect, plaintiff asks the Court to adopt a rule whereby once an allegation of sexual misconduct is raised in an EEOC proceeding, the plaintiff can then

raise any number of unrelated allegations, concerning conduct by different employees, in future district court proceedings, so long as they relate to "conditions . . . at the institution." The Court declines to adopt such a rule, as "[t]he purpose of the notice provision, which is to encourage settlement of discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *Miller v. Int'l Telephone & Telegraph*, 755 F.2d 20, 26 (2d Cir. 1985), *cert. denied*, 474 U.S. 851 (1985). *See Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008) (where "plaintiff's administrative complaint contain[ed] no reference to repeated conduct or the cumulative effect of individual acts" but was "based on [a] single act of abuse," plaintiff failed to exhaust administrative remedies with respect to other, unrelated acts); *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 134-35 (E.D.N.Y. 2002) (concluding, where plaintiffs' administrative complaints consisted of a single, specific "alleged discriminatory incident," an investigation into claims relating to earlier complaints of discrimination or hostile work environment would not be reasonably expected to grow out of the administrative complaints).

 In any event, as discussed below, the October 18, 2013 incident is sufficient to establish a hostile work environment, whereas plaintiff's other allegations regarding the work environment are not sufficiently severe and pervasive to support a hostile work environment claim.

### b)      *Work Environment*

In the Second Circuit, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment under Title VII." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437(2d Cir. 1999) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995)) (internal quotation mark omitted), *abrogation on other grounds recognized by Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 207 (2d Cir. 2006)); *see also Dillon*, 85 F. Supp. 3d at 663

(finding that a single incident where a co-worker "made direct contact with . . . [plaintiff's] buttock was sufficient to constitute the creation of a hostile work environment"); *Stathatos*, 2010 WL 2024967, at *5 (finding that plaintiff's allegation that a coworker "intentionally groped her buttocks can alone defeat defendants' motion for summary judgment"); *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 185-86 (E.D.N.Y. 2012) (concluding that a single instance of a co-worker "grabbing and squeezing" one of plaintiff's breasts was enough to defeat summary judgment because "[i]ntentionally grabbing, squeezing, or otherwise feeling an intimate part of another's body is vastly different than brushing against it—whether on purpose or by accident.") (collecting cases).

Accordingly, even without taking into account any of plaintiff's allegations aside from the October 18, 2013 assault, it is clear that because Madison intentionally slapped and squeezed her buttocks, in a manner that was not accidental and involved bending her over, Def. 56.1 Stmt. ¶¶ 25-28; Pl. 56.1 Resp. ¶¶ 25-28, a reasonable jury could find that plaintiff suffered a hostile work environment. *See Redd*, 678 F.3d at 177 (quoting *Worth*, 276 F.3d at 268) ("Direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment."). Conversely, plaintiff's other complaints, both those that are barred by the administrative exhaustion doctrine and those that are not (*i.e.*, those relating specifically to Madison), are not severe and pervasive enough (when considered separately from the elevator assault) to alter the conditions of her employment, especially since, with respect to the practice of employees greeting each other with a hug and a kiss, she both reciprocated and initiated the greeting, never complained that it made her uncomfortable, and was able to "[j]ust stop" doing it at her will. Def. 56.1 Stmt. ¶¶ 95-100; Pl. 56.1 Resp. ¶¶ 95-100; *see Holtz*, 258 F.3d at 75 (quoting *Faragher*, 524 U.S. at 778) (citation and internal quotation marks omitted) ("[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.").

<em>c)</em>    <strong><em>Employer Liability</em></strong>

Having established that a reasonable jury could conclude that plaintiff was subject to a hostile work environment, the Court must determine whether "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Howley*, 217 F.3d at 153 (quoting *Perry*, 115 F.3d at 149). "Where the hostile environment is created by a nonsupervisory coworker, the employer is liable only if it was negligent in controlling the working conditions." *Hoag*, 279 F. Supp. 3d at 480.

The parties dispute whether Madison was, in fact, a supervisory coworker with respect to plaintiff. The Court concludes that because Madison was not empowered to take tangible employment actions against plaintiff, *i.e.*, actions constituting "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Edwards v. Khalil*, 2016 WL 131249, at *14 (S.D.N.Y. Mar. 31, 2016) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)), he was not plaintiff's supervisor for purposes of Title VII liability.

Plaintiff notes that *Vance* created an exception to the rule that a supervisor must be empowered to take a tangible employment action against the victim, holding that where a modern organization has abandoned a hierarchical management structure and confined decision-making power to a small number of individuals, "[u]nder those circumstances, the employer may have effectively delegated the power to make tangible employment actions to the employees on whose recommendations it relies." Pl. Mem. at 26-27 (quoting *Vance*, 570 U.S. at 446-47). Building on that, plaintiff relies on *Rock v. Blaine*, 2018 WL 1415202 (N.D.N.Y. Mar. 20, 2018),

39

which involved the question of whether a prison lieutenant was a supervisor over the plaintiff. Pl. Mem. at 27-28. In *Rock*, the lieutenant in question "signed off on [plaintiff's] annual evaluation and had the authority to give her orders with regard to how she carried out her duties." 2018 WL 1415202, at *10. Here, however, there is no evidence in the summary judgment record suggesting that decision-makers in the BOP relied on Madison's recommendations (or that he even made such recommendations) about plaintiff in making employment decisions.

Further, courts interpreting *Vance* have rejected arguments that tie "supervisor status to the ability to exercise significant direction over another's daily work." *Ward v. Shaddock*, 2016 WL 4371752, at *10 (S.D.N.Y. Aug. 11, 2016) (quoting *Vance*, 570 U.S. at 431). Neither assigning tasks outside the plaintiff's job duties, distributing daily work assignments, recommending discipline to superiors, nor controlling an employee's hours and assignments within their job description have been held sufficient to establish supervisor status. *Id*. (collecting cases).

In this case, the record on summary judgment shows that, at most, Madison was intermittently in a managerial role, when plaintiff worked voluntary overtime or was selected to augment a custody post, and if he was on shift at the same time. Def. 56.1 Stmt. ¶¶ 10-11; Pl. 56.1 Resp. ¶¶ 10-11; Latham Supp. Decl. ¶ 8. However, the record also demonstrates that Madison was not in plaintiff's reporting line, had no control over her benefits and compensation, was not involved in her evaluations or consideration for promotions, and was in no greater position to report her for misconduct or recommend her for awards than any other employee. Latham Supp. Decl. ¶¶ 11, 13-15. Plaintiff's primary role, as a Medical Records Technician, involved reporting to the Assistant Health Service Administrator and the Health Service Administrator, Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Resp. ¶ 2, and maintaining medical records of

inmates, and thus she was in a different department from Madison, who was one of the 10 to 12

lieutenants that supervise correctional officers overseeing inmates. Def. 56.1 Stmt. ¶ 9; Pl. 56.1

Resp. ¶ 9. Accordingly, plaintiff must show that defendant was negligent in controlling the

working conditions at MCC.

"An employer may be negligent where it 'did not monitor the workplace, failed to

respond to complaints, failed to provide a system for registering complaints, or effectively

discouraged complaints from being filed.'" *Holt v. Dynaserv Indus., Inc.*, 2016 WL 5108205, at

*9 (S.D.N.Y. Sept. 19, 2016) (quoting *Vance*, 570 U.S. at 449). In this case, the summary

judgment evidence shows that defendant had an anti-discrimination policy in place that was

posted on its intranet, trained wardens regarding sexual harassment at conferences, and provided

annual refresher training that included (at least in some years) sexual harassment. Moreover,

plaintiff clearly knew how to make a harassment complaint, and did so, reporting the October

2013 assault to the EEO Counselor ten days after it occurred. Def. 56.1 Stmt. ¶ 32; Pl. 56.1 Resp.

¶ 31. The BOP conducted a prompt investigation as soon as plaintiff complained, took

immediate steps to minimize contact between plaintiff and Madison, and effectively put a stop to

Madison's harassing behavior.

Plaintiff feels that Madison's ultimate punishment was insufficient, and that greater steps

should have been taken to prevent her from seeing him, as they still had some overlap within the

MCC. Def. 56.1 Stmt. ¶ 40; Pl. 56.1 Resp. ¶ 39. However, their interactions following the

elevator incident appear to have been limited to merely seeing each other in passing, Def. 56.1

Stmt. ¶ 43; Pl. 56.1 Resp. ¶ 42, and an occasional phone call to discuss a custody post. Def. 56.1

Stmt. ¶ 48; Pl. 56.1 Resp. ¶ 47. Even when their shifts overlapped, when plaintiff was working

custody, Madison was instructed to make arrangements for the other lieutenant on duty to make

the rounds on her unit, and plaintiff does not contend they interacted during these shifts. Def. 56.1 Stmt. ¶¶ 46-47; Pl. 56.1 Resp. ¶¶ 45-46. After February 2014 (when a two-week annual training resulted in plaintiff being assigned to correctional services, Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Resp. ¶ 43), plaintiff cannot recall any specific instances where Madison was one of the lieutenants on duty while she was assigned to a custody post, although she's "pretty sure it happened." Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Resp. ¶ 48.[15] Plaintiff concedes that Madison has not behaved inappropriately towards her, in any way, since the October 2013 incident. Def. 56.1 Stmt. ¶ 51; Pl. 56.1 Resp. ¶ 50.

Plaintiff's contention that Madison's punishment was too light is not only a subjective opinion; it is "immaterial" because "there is no requirement that the remedy include punishing the co-worker responsible for the sexual harassment"; Title VII "simply requires that the remedial action taken be reasonably calculated to end the sexual harassment." *Cowan v. City of Mount Vernon*, 2017 WL 1169667, at *6 (S.D.N.Y. Mar. 28, 2017) (quoting *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000)). Here, because defendant's remedial measures successfully prevented further harassment by Madison, plaintiff cannot show that defendant was "negligent in controlling the working conditions." *Hoag*, 279 F. Supp. 3d at 480; *see also Oliver v. N.Y. State Police*, 2020 WL 1989180, at *31 (N.D.N.Y. Apr. 27, 2020) (where the harasser was directed to have no further supervisory contact with plaintiff and plaintiff did not allege any further harassment by him after that date, the employer was not negligent, and summary judgment was warranted, even though the internal investigation unit disregarded corroborating testimony of gender discrimination).

---

[15] And even during those two weeks, Madison was instructed to have the other lieutenant on shift make the rounds in plaintiff's unit. Def. 56.1 Stmt. ¶ 46; Pl. 56.1 Resp. ¶ 45.

Here, the undisputed facts show that Madison was not plaintiff's supervisor and that defendant – which provided an avenue for plaintiff to complain when she was sexually assaulted and then took prompt remedial steps – was not negligent in controlling the working conditions at MCC. Defendant is therefore entitled to summary judgment on plaintiff's sexual harassment claim.

### 2.      Retaliation Claim

Plaintiff's retaliation claim is premised on the following three incidents, which she contends constituted retaliation for her having initiated EEOC proceedings following the October 2013 incident: (1) the cease and desist letter that she received, instructing her to cease further contact with Madison (which Madison also received); (2) the fact that the OIA investigation resulted in her being investigated, and ultimately formally reprimanded for personal use of a BOP computer, which was uncovered during the course of investigating her complaint of sexual assault; and (3) jobs for which she applied following her complaints of harassment, for which she was not selected, before ultimately being selected for a promotion on July 19, 2016.

#### a)      Retaliation Premised on Investigation and Disciplinary Action

Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Fincher*, 604 F.3d at 721 (quoting *Burlington N.*, 548 U.S. at 68). Brief inquiries that do not result in any discipline have been held to be "trivial harms" or "petty slights or minor annoyances" that do not support a retaliation claim. *Tepperwien Entergy Nuclear Ops, Inc.*, 663 F.3d 556, 569-70 (2d Cir. 2011) (quoting *Burlington N.*, 548 U.S. at 68). Even a "notice of discipline" is not "a materially adverse employment action" if it "does not create a materially adverse change in working conditions." *Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp. 3d 255, 279-80 (N.D.N.Y. Mar. 17, 2017) (citing *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger*

*Corp.*, 536 U.S. 101)); *Lyman v. NYS OASAS*, 928 F. Supp. 2d 509, 520 (N.D.N.Y. 2013) ("[T]he issuance of a 'counseling memorandum' and a 'notice of discipline,' without any further evidence regarding a materially adverse effect thereof, is not an adverse employment action as a matter of law.").

Here, cease and desist memoranda were issued to both plaintiff and Madison at the outset of the initial investigation, instructing them to avoid further interaction with each other. Def. 56.1 Stmt. ¶¶ 36-37; Pl. 56.1 Resp. ¶¶ 35-36. There is no evidence in the record that these memoranda carry any adverse effect on employment. Plaintiff points out that Associate Warden Iwuagwu, who headed the threat assessment team, testified that he has since realized that handing a cease and desist letter to a complaining employee is akin to a punishment "by saying you are part of the problem." Def. 56.1 Stmt. ¶ 39; Pl. 56.1 Resp. ¶ 38; EEOC Tr. at 1013:6-20.[16] However, Associate Warden Iwuagwu's retrospective feelings about the memoranda do not go to the legal question of whether they amount to a retaliatory adverse employment action, which depends on whether they "create a material adverse change in working conditions" or otherwise "produce[] an injury or harm." Further, Latham testified, based on personal knowledge, that cease and desist memoranda are not maintained in personnel records. Latham Supp. Decl. ¶¶ 1-4. Accordingly, an initial memorandum, at the outset of an investigation, which tells both the victim and the accused harasser to cease interacting with each other, and which is not maintained in personnel records, is not an adverse employment action that could form the basis of a retaliation claim on its own.

---

[16] By contrast, Warden Linaweaver, Captain Ward, and Covington testified that a cease and desist memorandum is not a disciplinary action. Def. 56.1 Stmt. ¶ 39; Pl. 56.1 Resp. ¶ 38; EEOC Tr. at 652:9-653:13, 734:12-13, 1204:7-18.

Plaintiff's complaints about the OIA investigation, however, include a sufficiently plausible claim of retaliation to survive summary judgment. The investigation resulted in a recommendation that plaintiff be suspended for three days for purported misuse of BOP computers. Def. 56.1 Stmt. ¶¶ 58, 64-66, 70-71; Pl. 56.1 Resp. ¶¶ 57, 64-66, 70, 72. This recommendation was reduced to a formal reprimand only after plaintiff's attorney became involved, Def. 56.1 Stmt. ¶ 72; Pl. 56.1 Resp. ¶ 73, and the reprimand would remain in her personnel file for up to two years following the date it was issued, September 6, 2016. Def. 56.1 Stmt. ¶ 73; Pl. 56.1 Resp. ¶ 74. Such an outcome could dissuade a reasonable employee from lodging a complaint of sexual harassment.

"A formal reprimand can be an adverse action for purposes of a retaliation claim, 'even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently,' because 'it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy.'" *Bowen-Hooks*, 13 F. Supp. 3d at 227-28 (quoting *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011) and collecting cases). This is because, under the objective standard established by *Burlington N.*, a formal reprimand "might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination." *MvAvey v. Orange-Ulster BOCES*, 2012 WL 161839, at *2 (S.D.N.Y. Jan. 18, 2012) (quoting *Burlington N.*, 548 U.S. at 68).

Further, in light of the mandate to consider the alleged acts of retaliation "both separately and in the aggregate," as "even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable," *Hicks*, 593 F.3d at 165, and because "[c]ontext matters," *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (quoting *Tepperwien*, 663 F.3d

at 568), the Court must consider that plaintiff only avoided a three-day suspension, her original recommended punishment, because her attorney became involved. Def. 56.1 Stmt. ¶ 72; Pl. 56.1 Resp. ¶ 73. Since the formal reprimand, standing alone, is sufficient to establish a retaliation claim, plaintiff has met her *prima facie* burden by offering sufficient evidence to permit a reasonable jury to conclude that she was retaliated against for engaging in protected EEO activity.

Defendant argues that there was no actionable retaliation because it has articulated a legitimate, non-retaliatory reason for the reprimand – namely that plaintiff violated the BOP's computer policy by sending three personal emails to Madison on BOP equipment. Def. Mem. at 27-30. However, although the Standards of Employee Conduct state that government property should be used for authorized purposes only, personal use of such office equipment is authorized where "there is only a negligible cost to the Government." Def. 56.1 Stmt. ¶ 65; Pl. 56.1 Resp. ¶ 65; Standards of Employee Conduct at 12. Defendant makes no showing that the cost of those three emails was more than "negligible." Instead, defendant notes that emails of a sexually explicit nature violate the policy, even if the number of emails exchanged is *de minimis*. Def. 56.1 Stmt. ¶ 66; Pl. 56.1 Stmt. ¶ 66. However, plaintiff's emails were not sexually explicit; nor was the picture she sent, which showed her in a dress below her knees from a holiday party. Def. 56.1 Stmt. ¶ 61; Pl. 56.1 Resp. ¶ 60; Doud Decl. Ex. L at 68. Moreover, the letter recommending plaintiff's suspension says noting about sexually explicit content; rather, it states that she "misused a government computer to receive and transmit non-work related messages of an inappropriate nature with a coworker while on duty," while citing to the portion of the Standards of Employee Conduct that explicitly *authorizes* personal use of BOP computers so long as the

cost to the BOP is negligible. Doud Decl. Ex. Q (Dkt. No. 49-17); *see* Standards of Employee Conduct at 13.

On this record, a reasonable trier of fact could conclude that defendant's articulated reason for reprimanding plaintiff was a pretext to mask retaliatory intent, such that summary judgment is inappropriate as to plaintiff's retaliation claim. *See Emilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 249-50 (S.D.N.Y. 2013) ("The apparent inconsistencies between Defendant's formal disciplinary policies and how Plaintiff was treated, together with the temporal proximity of Plaintiff's purported claims and her termination, are enough to create a triable issue off act as to whether Defendant's stated reason for [taking an adverse employment action against plaintiff] was pretextual.") (collecting cases).

### b)      *Retaliation Premised on Failure to Promote*

I reach a different conclusion with respect to plaintiff's retaliation claim to the extent it is premised on BOP's purported failure to promote her. "[C]ourts within the Second Circuit have held that allegations of a failure to promote *quickly* do not establish an adverse employment action and, thus, fail to allege unlawful discrimination." *Hettirachchi v. County of Suffolk*, 2020 WL 5848617, at *19 (E.D.N.Y. Sept. 30, 2020) (collecting cases and emphasis in the original); *see also Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *14 (S.D.N.Y. Mar. 31, 2014) ("plaintiff's failure-to-promote claim cannot survive a motion to dismiss because of the simple fact that plaintiff actually received a promotion"), *report and recommendation adopted as modified*, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014). Accordingly, the fact that plaintiff was selected for a promotion on July 19, 2016, effective September 4, 2016, Def. 56.1 Stmt. ¶¶ 5, 94; Pl. 56.1 Resp. ¶ 5, 93, undercuts her retaliation claim with respect to defendant's purported failure to promote her.

47

Moreover, plaintiff has not provided *any* evidence that *any* individual in charge of the decision-making with respect to *any* of the positions for which she applied was even aware of her EEO activity, let alone that they had retaliatory animus towards her. Def. 56.1 Stmt. ¶¶ 77-95; Pl. 56.1 Resp. ¶¶ 78-94. Given that "[t]he ultimate burden of persuasion, of course, remains with the plaintiff," *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (collecting cases), the lack of any evidence of a retaliatory animus is fatal. *See Grandy v. Manhattan and Bronx Surface Transit Operating Auth.*, 2018 WL 4625768, at *11 n.20 (S.D.N.Y. Sept. 26, 2018) (granting summary judgment, in a single footnote, as to plaintiff's retaliation claims arising out of a failure to promote because she "offered no evidence at all of a causal connection.").

As to the first relevant position for which plaintiff was passed up (where she and 18 other BOP employees were identified as eligible for the position), the selection decision was made on October 20, 2014 – more than 11 months after she reported Madison's assault – and plaintiff presents no evidence that the decisionmaker had knowledge of her EEO activity, let alone a retaliatory motive. Def. 56.1 Stmt. ¶¶ 82-83; Pl. 56.1 Resp. ¶¶ 82-83. *See Murray*, 528 F. Supp. 2d at 275 (collecting cases) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.").

The second relevant position was one where plaintiff and 27 other employees were identified as eligible, and plaintiff again presents no evidence that the decisionmaker had knowledge of her EEO activity, let alone a retaliatory motive. Def. 56.1 Stmt. ¶ 84; Pl. 56.1 Resp. ¶ 84.

Further, the evidence shows that Associate Warden Bergami, who was the selecting official for a position in 2015 for which plaintiff applied but was not selected (out of 19 eligible

candidates), was not aware of any EEO activity by any applicant. Def. 56.1 Stmt. ¶¶ 86-89; Pl. 56.1 Resp. ¶¶ 86-88. Plaintiff concedes all of this, offering only that Bergami was not aware of whether or not two officials who conducted plaintiff's reference check learned about her prior EEO activity. Pl. 56.1 Resp. ¶ 87. This is not evidence; it is, at best, speculation. Plaintiff offers no evidence that her EEO activity was actually known by a decisionmaker, much less a factor in the hiring decision.

With respect to another position for which plaintiff applied and was not selected (another position with MDC) the decisionmaker, Warden Quay, was presented with 21 qualified applicants, including plaintiff, selected seven individuals, all of whom already worked at MDC at the time, and was unaware of any instance where an applicant's EEO activity was raised in connection with reference-checking for promotions. Def. 56.1 Stmt. ¶¶ 90-93; Pl. 56.1 Resp. ¶¶ 89-92.

Plaintiff attempts to overcome this by pointing out that she was denied for 10 promotions for which she was qualified and "[r]ejection for multiple promotions for which an employee is qualified may preclude summary judgment." Pl. Mem. at 38. However, in the case plaintiff cites to, *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391 (S.D.N.Y. 2017), the defendant did not simply fail to promote plaintiff into eight positions for which she was qualified; it claimed that she was *un*qualified because the role required Sunday work – to which she had a religious objection – notwithstanding that the job description did not mention any requirement to work on Sunday. *Id*. at 404-06. *Chavis* is thus inapposite, as there is no evidence in the case before me that the legitimate, non-retaliatory reasons for passing plaintiff up for promotion were illusory.

Plaintiff also points out that of the seven applicants selected by Warden Quay for the position at MDC, plaintiff was more qualified than two of them. Pl. Mem. at 17-18, 38-39.

However, plaintiff elsewhere concedes that all seven of those individuals were already working at MDC at the time of their promotion. Def. 56.1 Stmt. ¶ 92; Pl. 56.1 Resp. ¶ 91. Quay testified that he had never encountered a situation where an applicant's EEO activity came up during the vouchering process, and plaintiff offers no response to his legitimate, non-retaliatory explanations for why he chose other individuals for the position. In short, plaintiff has not offered any evidence, whether it be temporal proximity, circumstantial evidence (such as disparate treatment of other employees engaged in similar protected activity), or evidence of specific retaliatory animus directed against her by the decision-makers who elected not to promote her for the positions she applied for, *see Gordon*, 232 F.3d at 117, that could "permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3 at 173. *See also U.S. v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 403 (S.D.N.Y. 2018) (noting that if defendant establishes a non-retaliatory motive, the plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action" and that a "plaintiff may prove a retaliatory motive by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.") (internal citations and quotation marks omitted) (collecting cases).

Further, although the Court must consider "allegations of retaliation 'both separately and in the aggregate'" to determine whether an adverse employment action occurred because "even minor acts of retaliation can be sufficiently 'substantial in gross' to be actionable," *Collazo v. County of Suffolk*, 163 F. Supp. 3d 27, 52 (E.D.N.Y. 2016) (quoting *Burlington N.*, 548 U.S. at 67-69), unlike the cease-and-desist memorandum and the OIA investigation, plaintiff's non-

selection for jobs involved entirely different decisionmakers, with no connection to those involved in disciplining her, and there is no evidence in the record that those instances of non-selection even constitute "minor acts of retaliation," such that they must be considered in the aggregate with plaintiff's surviving retaliation claim. For the foregoing reasons, the Court concludes that defendant is entitled to summary judgment as to the portion of plaintiff's retaliation claim that is premised on a purported failure to promote.

### 3.    Retaliatory Harassment Claim

Plaintiff's allegations of retaliatory harassment are limited to a few vague incidents – she was prevented from heating up her food by a co-worker; on two occasions she was sent to the roof of MCC and left there for an indeterminate period of time; once she thought the elevator purposefully skipped her floor when she was waiting on it; certain coworkers stopped saying hello to her; she thought there were instances where her name was skipped for overtime; once she was not paid for 30 overtime shifts (but was subsequently paid all the money owed); and on three occasions coworkers made derogatory comments about her, including telling incoming employees, "Don't talk to her. That's the sexual harassment girl. [ ] She'll report you." Def. 56.1 Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111; Small Dep. Tr. 133:9-135:15, 138:25-140:14.

A plaintiff alleging retaliatory hostile work environment following complaints of discrimination "must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of [her] employment." *Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 137 (quoting *Rasco*, 2009 WL 690986, at *15). The isolated incidents that plaintiff complains about are not pervasive and concerted, were not extreme in their severity (plaintiff described being sent to the wrong floor and her treatment after her EEO activity as "[j]ust dumb things," Small Dep. Tr. at 133:14-134:21, and she did not even recall the three instances where

derogatory comments were made towards her at her deposition, only testifying as to them at her EEOC hearing, *see* Def. 56.1 Stmt. ¶ 111; Pl. 56.1 Resp. ¶ 111), and thus cannot support a claim for retaliatory harassment. *See Bobbitt v. N.Y.C. Health and Hosp. Corp.*, 2009 WL 4975196, at *9 (S.D.N.Y. Dec. 22, 2009) (in the context of a hostile work environment claim for Title VII racial discrimination, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments") (footnote omitted); *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*, 2008 WL 2971467, at *15 (S.D.N.Y. July 31, 2008) (finding that where plaintiff alleged six instances of being belittled, undermined, and shouted at by his supervisor, even assuming they were all driven by his national origin or age, "such '[i]solated incidents or episodic conduct [would] not support a hostile work environment claim.'") (quoting *Richardson*, 180 F.3d at 437 and collecting cases). None of the instances alleged following plaintiff's complaint of EEO activity approach the level of severity of sexual assault, where an isolated incident can alone support a hostile work environment claim.

Since the summary judgment record does not contain any evidence of actionable retaliatory harassment, the Court does not reach the question of whether there is a basis to impute the purported harassment to the defendant. Defendant is entitled to summary judgment as to plaintiff's claim for retaliatory harassment.

### III.    CONCLUSION

For the reasons stated above, it is hereby ORDERED that defendant's motion for summary judgment is DENIED as to plaintiff's claim for retaliation, insofar as it relates to the reprimand she received for misuse of BOP computers (including the circumstances and investigation leading up to that reprimand), and GRANTED as to all of plaintiff's other claims.

Dated: New York, New York
      March 31, 2021                                        **SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**